EXHIBIT 2

Form 1221-002
(December 2023)



**UNITED STATES**
DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT

**MANUAL**    **TRANSMITTAL SHEET**

| | |
|---|---|
| Release | 6-144 |
| Date | 10/15/2024 |
| Office Code | HQ410 |

Subject: 6330 – Management of Wilderness Study Areas

FOIA Designation Letter:    P

1. <u>Updates, supersedes, or rescinds:</u>

   This transmittal sheet updates MS 6330 – Management of Wilderness Study Areas.

2. <u>Explanation of Materials Transmitted:</u>

   This updates MS 6330 – Management of Wilderness Study Areas, specifically page 1-1, section 1.1 Purpose.

3. <u>Reports Required:</u>

   None

4. <u>Delegations of Authority Updated:</u>

   No changes to delegation of authority are made in this manual.

5. <u>Filing Instructions: File as directed below.</u>

   **REMOVE**

   Page 1-1 of 6330 (Rel. 6-134)
   (Total: 1 Page)

   **INSERT**

   New page 1-1 of 6330 (Rel. 6-144)
   (Total: 1 Page)

S:/ Carla Bock
Assistant Director
National Conservation Lands and
Community Partnerships

MS 6330 – Management of Wilderness Study Areas (P)

TC- 1

# Table of Contents

1.1    Purpose.................................................................................................................. 1

1.2    Objectives............................................................................................................. 2

1.3    Authority.............................................................................................................. 2

1.4    Responsibility....................................................................................................... 2

1.5    References............................................................................................................. 3

1.6    Policy.................................................................................................................... 4

   A.    Congressional Direction ....................................................................................... 4

      1.    **Direction in FLPMA**................................................................................ 4

      2.    **Original and subsequent reviews** ........................................................... 4

      3.    **Differences in the management of wilderness and the management of WSAs**............ 5

   B.    General Policy ....................................................................................................... 6

      1.    **Managing to prevent impairment** .......................................................... 6

      2.    **Enforcement** ............................................................................................ 7

      3.    **Restoration** .............................................................................................. 7

      4.    **Boundaries of WSAs** ............................................................................... 8

      5.    **New discretionary uses** ........................................................................... 9

      6.    **Maintain improved conditions** ............................................................... 9

   C.    The Non-Impairment Standard................................................................................ 9

      1.    **Defining the non-impairment standard.** ................................................. 9

      2.    **Exceptions to non-impairment** ............................................................. 10

   D.    Policies for Specific Activities ............................................................................. 12

      1.    **Cultural and paleontological resources** ............................................... 12

      2.    **Fire**......................................................................................................... 12

      3.    **Grazing management** ............................................................................. 15

      4.    **Lands actions: disposals, use authorizations, rights-of-way, access, and withdrawals**.. 17

      5.    **Minerals**................................................................................................. 19

      6.    **Recreation** ............................................................................................. 23

      7.    **Soil, water, air** ....................................................................................... 28

      8.    **Vegetation**............................................................................................. 29

      9.    **Visual resources management** ............................................................... 32

      10.    **Wild horse and burro management** ..................................................... 32

      11.    **Wildlife.**................................................................................................. 33

   E.    Evaluation of Proposed Actions............................................................................ 39

MS 6330 – Management of Wilderness Study Areas (P)

TC- 2

1.    Uses or facilities subject to the WSA Management Manual..............................39

2.    Review requirements..................................................................................40

3.    Procedures for evaluation of proposed actions subject to the WSA Management
      Manual ...............................................................................................40

1.7.   File and Records Maintenance.....................................................45

1.8.   Data Standards........................................................................45

Glossary of Terms ..............................................................................1

## 1.1  Purpose.

The purpose of this manual is to continue to provide policy on the non-impairment standard to Bureau of Land Management (BLM) personnel for use when managing Wilderness Study Areas (WSAs), which are part of the BLM's National Landscape Conservation System. Specifically, this policy applies to: (1) WSAs identified by the wilderness review required by Section 603 of the Federal Land Policy and Management Act (FLPMA) and currently under review by Congress (this includes "Instant Study Areas"), sometimes referred to as "603 WSAs"; (2) legislative WSAs (WSAs established by Congress); and (3) WSAs identified during the land use planning process under the authority of Section 202 of FLPMA, sometimes referred to as "202 WSAs." This includes those 202 WSAs that were identified after Wilderness Study Reports were submitted to Congress. This policy does not apply to areas designated by Congress as Wilderness or to other lands that may have wilderness characteristics. Nor does this policy apply to Alaska outside of the Central Arctic Management Area WSA designated under the authority of Sections 1001 and 1004 of the Alaska National Interest Lands Conservation Act (ANILCA) and which is managed pursuant to all relevant sections of ANILCA.

This policy is intended to guide BLM personnel in the specific decisions that arise every day in the management of these areas. First issued in 1979 and most recently revised in 1995, previous iterations of this policy were referred to as the interim management policy (IMP). The term "interim" was used because the policy was expected to be in effect only for a limited period of time and focused on the short-term stewardship of WSAs. The BLM will continue to manage WSAs until Congress acts, and therefore the manual addresses the longer term stewardship of WSAs. The Wilderness Study Area Management Manual should be applied in all cases where the IMP is currently applied.

The policy found in this manual applies only to the management of WSAs. With respect to 603 WSAs, the policy applies during the time an area is under wilderness review, which ends when Congress acts on the WSA by either designating the area as wilderness or releasing it for other purposes. With respect to certain 202 WSAs (those not submitted to Congress in the Wilderness Study Reports), the policy applies until an area identified as a 202 WSA is changed through a land use planning process (Described more fully in Section 1.6.A, below).

Depending on how Congress acts on a WSA, different laws, regulations, and management policies will apply to the area. For example, WSAs designated by Congress as wilderness will be managed pursuant to the Wilderness Act of 1964 (16 U.S.C. 1131 et seq.), the area's designating statute, the BLM's wilderness regulations at 43 CFR 6300, and BLM Manual 6340—Management of Designated Wilderness Areas. WSAs that are released by Congress from wilderness study will no longer be subject to this manual and will be managed under general BLM management authorities found in FLPMA (43 U.S.C. 1701 et seq.) and associated regulations and policies, including applicable land-use plans.

This manual is not the only policy that governs the management of WSAs. The BLM operates under many other laws and policies that may affect whether and how an activity may take place on WSAs.

MS 6330 – Management of Wilderness Study Areas (P)

1- 2

## 1.2 Objectives.

The BLM's objectives for implementing this policy are to:

A. Consistent with relevant law, manage and protect WSAs to preserve wilderness characteristics so as not to impair the suitability of such areas for designation by Congress as wilderness.

B. Provide policy guidance for prolonged stewardship of WSAs until Congress makes a final determination on the management of WSAs.

## 1.3 Authority.

A. Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. 1701 *et seq.*) (FLPMA)

B. National Environmental Policy Act of 1969, as amended (42 U.S.C. 4321 *et seq.*) (NEPA)

C. Omnibus Public Land Management Act of 2009 (16 U.S.C. 7202)

## 1.4 Responsibility.

A. Director, Bureau of Land Management, through the Assistant Director, National Landscape Conservation System and Community Partnerships, shall

1. Establish policy and guidance to support the management and protection of WSAs so as not to impair the suitability of such areas for preservation as wilderness.

2. Provide budget and planning guidance related to the administration of WSAs.

3. Coordinate WSA policy and budget with other BLM programs at the national level.

4. Develop and maintain relationships with other Federal agencies, tribal governments, state and local governments, national-level organizations and non-profit groups, and the general public regarding the stewardship of WSAs.

5. Review land use plans, revisions, and amendments affecting WSAs and ensure that these plans, revisions, and amendments conform to FLPMA, NEPA, relevant designating legislation and other applicable laws, and BLM policies and guidance.

B. State Directors shall:

1. Implement policy guidance and direction reflecting national goals for WSAs.

2. Implement budget and planning guidance related to the administration of WSAs.

3. Coordinate WSA policy and budget with other BLM programs at the state level.

MS 6330 – Management of Wilderness Study Areas (P)

1- 3

   4.  Develop and maintain relationships with other Federal agencies, tribal
       governments, state and local governments, friends' groups and other non-profit
       organizations, and the general public regarding the stewardship of WSAs.

   5.  Approve land use plans, revisions, and amendments affecting WSAs and ensure
       that these plans, revisions, and amendments conform to FLPMA, NEPA,
       relevant designating legislation and other applicable laws, and BLM policies
       and guidance.

C.  District and Field Managers with WSAs within their purview shall:

   1.  Consistent with relevant law, manage and protect WSAs so as not to impair the
       suitability of such areas for preservation as wilderness.

   2.  Ensure that all decisions and activities within WSAs conform to FLPMA,
       NEPA, designating legislation and other applicable laws, and BLM policies and
       guidance.

   3.  Develop and maintain relationships with other Federal agencies, tribal
       governments, state and local governments, friends' groups and other non-profit
       organizations, and the general public regarding the stewardship of WSAs.

## 1.5  References.

A.  Alaska and Oregon and California Grant Lands Act of 1937 (43 U.S.C. 1181d.)

B.  Archaeological Resources Protection Act of 1979, as amended (16 U.S.C. 470aa
    et seq.)

C.  Clean Air Act (2 U.S.C. §7401 et seq.)

D.  Federal Onshore Oil and Gas Leasing Reform Act of 1987 (30 U.S.C. § 181)

E.  National Historic Preservation Act of 1966  (16 U.S.C. 470)

F.  Wilderness Act of 1964, as amended (16 U.S.C. 1131 *et seq.*)

G.  Wild Free-Roaming Horse and Burro Act of 1971 (16 U.S.C. 1331 *et seq.*)

H.  Title 43 Code of Federal Regulations, Part 46—Implementation of the
    National Environmental Policy Act of 1969

I.  Title 43 Code of Federal Regulations, Part 2200—Exchanges: General Procedures

J.  Title 43 Code of Federal Regulations, Part 2800—Rights-of-Way under the
    Federal Land Policy and Management Act

K.  Title 43 Code of Federal Regulations, Part 2920—Leases, Permits and Easements

L.  Title 43 Code of Federal Regulations, Part 3400—Coal Management

M. Title 43 Code of Federal Regulations, Part 3500—Leasing of Solid Mineral Other

MS 6330 – Management of Wilderness Study Areas (P)

1- 4

Than Coal and Oil Shale

N. Title 43 Code of Federal Regulations, Part 3800—Mining Claims Under the General Mining Laws

O. BLM Manual 1626—Travel and Transportation Manual

P. BLM Manual 6340—Management of Designated Wilderness Areas

Q. BLM Manual 6830 – Animal Damage Control

R. BLM Manual 8270—Managing Paleontological Resources

S. BLM Manual 8100 series—Managing Cultural Resources

T. BLM Handbook 1790-1—National Environmental Policy Act

U. BLM Handbook H-4180-1—Rangeland Health Standards

V. BLM Handbook H-8120-1—Guidelines for Conducting Tribal Consultation

W. Handbook-8270-1—General Procedural Guidance For Paleontological Resource Management

X. Guidance for Implementation of Federal Wildland Fire Management Policy

**1.6 Policy.**

A. <u>Congressional Direction</u>

1. Direction in FLPMA

Wilderness preservation is part of the BLM's multiple-use mandate, and the wilderness resource is recognized as one of the array of resource values considered in the land-use planning process. Section 603(c) of FLPMA provides direction to the BLM on the management of WSAs and states that with some exceptions (explained more fully below in Section 1.6.C.2): "During the period of review of such areas and until Congress has determined otherwise, the Secretary shall continue to manage such lands according to his authority under this Act and other applicable law in a manner so as not to impair the suitability of such areas for preservation as wilderness." This language is referred to as the "non-impairment" mandate. The BLM developed a non-impairment standard (see 1.6.C) in this manual) to meet this mandate.

2. Original and subsequent reviews

The original wilderness review process outlined under Section 603 of FLPMA had three phases: inventory, study, and reporting to Congress. Public involvement was encouraged in all phases of the process, with opportunity provided for comment, participation, and review. Section 603 of FLPMA directed the BLM to carry out a wilderness review of the public lands. The wilderness inventory was conducted from 1978 to 1980, and excluded Alaska and Oregon and California Grant Lands Act of 1937 (O&C Act) lands managed primarily for timber production. The

MS 6330 – Management of Wilderness Study Areas (P)

1- 5

original inventory focused on roadless areas of public lands of 5,000 acres or more and on roadless islands, but also included areas of less than 5,000 acres that had wilderness characteristics in association with contiguous roadless lands managed by another agency, and areas of less than 5,000 acres that had wilderness characteristics and could practicably be managed to keep those characteristics in an unimpaired condition. Additional WSAs were designated through the BLM land use planning process under the authority of Sections 201,202, and 302 of FLPMA after the reports to Congress were completed in 1993.

The inventory phase identified areas that were found to have the characteristics of wilderness enumerated by Congress in Section 2 (c) of the Wilderness Act of 1964:

> "A wilderness…(1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value."

When these characteristics were found within a defined boundary, the presence of the wilderness resource was documented and the area was classified as a WSA.

During the study phase, all values, resources, and uses occurring within each WSA were analyzed, pursuant to the National Environmental Policy Act (NEPA), through legislative environmental impact statements. When the study was completed, recommendations as to the suitability or unsuitability of each WSA for designation as wilderness were submitted to the President through the Secretary of the Interior, and then from the President to Congress. FLPMA required that the reports on the Section 603 WSAs be sent to the President by October 21, 1991, and to Congress by October 21, 1993. Section 202 WSAs designated through the BLM's land use planning process prior to the 1993 report were forwarded to Congress. Section 202 WSAs designated subsequent to the 1993 report were not forwarded to Congress.

For those Section 202 WSAs created after the 1993 Report to Congress, the BLM may, through land use planning, adjust the status of and management standardsassociated with those post-1993 Section 202 WSAs.

Wherever a baseline date is pertinent to WSA management, October 1976 is used for all Section 603 and Section 202 WSAs that were reported to Congress by October 21, 1993, while the date of designation is used for all 202 WSAs not identified in the reports to Congress, as well as legislative WSAs.

3. Differences in the management of wilderness and the management of WSAs

MS 6330 – Management of Wilderness Study Areas (P)

1- 6

Designated wilderness is managed pursuant to the Wilderness Act, which states that these areas shall be administered to "preserve wilderness character." For WSAs,

FLPMA mandates that the BLM "not impair the suitability" of areas we have identified as "having wilderness characteristics." There is a difference between these two mandates. As a result of this difference, the varying legal mandates of FLPMA and the Wilderness Act, and the history of the BLM's management of WSAs, this manual differs in both content and form from BLM Manual 6340, Management of Designated Wilderness Areas.

B.  General Policy

The BLM's management policy is, except in the cases stated below (see section 1.6.C.2), to continue resource uses on lands designated as WSAs in a manner that maintains the area's suitability for preservation as wilderness. The BLM's policy will protect the wilderness characteristics of all WSAs in the same or better condition than they were on October 21, 1976 (or for Section 202 WSAs not reported to Congress, the date the WSA was designated), until Congress determines whether or not they should be designated as wilderness. When managers are in doubt as to a course of action in a WSA, this should serve as a guiding principle.

1.  Managing to prevent impairment

a.  Underline: Preventing impairing activities through public information. It is important to ensure that the public, commercial entities, other governmental entities, and BLM staff are aware of the location of WSAs and their management requirements. To this end, the BLM will post signs at key WSA access points, provide maps and information about WSAs on BLM websites, and ensure that internal and external maps include WSA boundaries. When possible, the BLM should also present information about WSAs to interested or affected organizations.

b.  Underline: Monitoring. All WSAs are to be monitored to ensure continued suitability for designation as wilderness at a frequency that will ensure compliance with the non-impairment standard described in section 1.6.C of this manual. Unless an alternative schedule is approved (see below), the minimum frequency of monitoring is at least once per month during the months the area is accessibleby the public, or more frequently where uses and activities warrant greater attention or where resource conflicts are present. Large WSAs may require more than one monitoring event per month in order to adequately monitor all parts of the WSA. Field Offices may utilize staff, volunteer assistance, Adopt- A-WSA efforts, ranger patrol, or cooperative agreements with local law enforcement agencies to ensure that WSAs are being monitored sufficiently to detect impairing activities. Aircraft may also be utilized to assist in monitoring activities.

Alternative monitoring schedules may be approved by the State Director for any WSA that could be effectively monitored less frequently than once per month.

MS 6330 – Management of Wilderness Study Areas (P)

1- 7

Alternative surveillance schedules must be tailored for the special needs of the WSA based on consideration of factors including but not limited to: inaccessibility, history of unauthorized activities and violations, and weather/seasons of use. At a minimum, the alternative monitoring schedule must specify the frequency of ground or air monitoring, the resources required to sustain the schedule, and a justification for replacing monthly monitoring with the alternative schedule. The approved alternative monitoring schedule must be in the WSA's permanent documentation file.

When an action is authorized within a WSA, regular monitoring by qualified BLM staff for project compliance must be included in planning and costs associated with the action.

    c.   Documentation. Field Offices must maintain a permanent file for each WSA. Each file must include photo documentation of primitive routes (formerly referred to as "ways"), range developments, mining activities, property boundaries, and other similar sites where, over time, activities may impact the naturalness of the WSA. The photo points chosen and frequency of documentation should be sufficient to identify impairing or potentially impairing conditions. Some developments may already be periodically documented by other BLM programs. In such cases, coordination with these programs is essential to prevent duplication of effort.

       Permanent files must also include a record of each monitoring visit, including the date of the visit and a narrative, and, where applicable, geospatial data. All monitoring visits must be documented; it is just as important to record a monitoring visit where no violations are detected as it is to record the observance of impairing activities. Field Offices are encouraged to utilize electronic databases to improve the efficiency of retrieving information and assessing trends from which to direct future monitoring and management actions.

  2.  Enforcement
As with all public lands, any violation of the regulations applicable to the use of WSAs, or public land management generally are subject to the enforcement authority of FLPMA (43 USC 1733(a)). Possible violations should be referred to the law enforcement ranger or special agent.

  3.  Restoration

    a.   Unauthorized impacts. The BLM's goal is to immediately restore the impacts caused by any unauthorized action to at least the condition that existed prior to the impact or that which existed in October 1976 (or on the designation date for Section 202 WSAs not reported to Congress) whichever is better. See also General Policy 7, Maintain Improved Conditions, in this sub-section. If the impacts are so severe as to make it impossible or unreasonably costly to restore, or if restoration efforts would result in greater loss of wilderness values than natural restoration, an alternative restoration strategy should be applied that achieves the maximum possible level of restoration.

       The BLM will attempt to collect costs of restoration from any and all persons

MS 6330 – Management of Wilderness Study Areas (P)

1- 8

responsible for causing impacts. If the person(s) responsible for the unauthorized impacts is not known, the BLM will undertake restoration and initiate action to locate the person(s) responsible and collect the restoration costs from these persons. If the person(s) responsible for the unauthorized impacts is known but unwilling to perform the needed restoration, the BLM will undertake restoration and initiate action to collect the costs from the responsible person(s).

    b. <u>Other impacts.</u> The BLM may remove structures and other facilities that impair wilderness characteristics, do not meet any of the exceptions to non-impairment, or are not permissible uses as detailed in section 1.6.D of this policy. The restoration of ecological processes is covered in sections 1.6.D.2 and D.8 of this manual.

4. Boundaries of WSAs

    a. <u>Boundary adjustments.</u> WSAs established under the authority of Section 603 of FLPMA are identified in the 1993 reports to Congress (as depicted on supporting maps), and can only be altered by Congress. Boundaries of legislative WSAs are established by the enabling legislation and cannot be adjusted unless specified in the legislation. Boundaries of Section 202 WSAs that were submitted to Congress cannot be altered through land use planning. Boundaries of Section 202 WSAs established through a Resource Management Plan (RMP) and not included in the Wilderness Study Reports submitted to Congress in 1993, may be adjusted through a subsequent RMP process, in accordance with standard BLM management of land boundaries policies. Impacts resulting from unauthorized activities may not be cited to adjust the boundaries of a WSA.

    b. <u>Boundary setbacks.</u> Except where Congress has specified, or in the case of a Section 202 WSA not reported to Congress where the applicable RMP defines setbacks, there are no setbacks to WSA boundaries. Where a WSA is bounded by a road, the WSA boundary is the edge of disturbance of that road that existed at the passage of FLPMA (or, for Section 202 WSAs, at the time the WSA was designated), or if one exists, the edge of any ROW. (Note: in order for the maps in the 1993 reports to Congress to be readable, the boundary lines on the map may not precisely follow the intended boundary feature, so as not to cover up the feature it is following.)

    c. <u>Inclusiveness</u>. The WSA includes all surface and subsurface features (such as caves) under the jurisdiction of the BLM.

    d. <u>Acquisition of land by exchange within WSAs.</u> Under the authority of 43 CFR 2200.0-6(f) and (g), upon acceptance of title to non-Federal land within the boundary of a WSA that has been exchanged with the BLM, that land is automatically added to the WSA and from that time on is subject to the WSA Management Manual. This provision applies only to inholdings, not edgeholdings.

MS 6330 – Management of Wilderness Study Areas (P)

1- 9

5. New discretionary uses
It is the BLM's policy not to establish new discretionary uses in WSAs that would impair the suitability of such areas for wilderness designation (see section 1.6.C). For example, identifying a mountain biking route on an existing primitive route may not create new surface disturbance or permanent facilities, but the use of the route may preclude potential designation the area as wilderness and would therefore violate the non-impairment standard. In some cases a local club or business, without consultation with the BLM, may have promoted WSA for a use that may impair the existing wilderness characteristics so as to constrain Congress' prerogative to designate the area as wilderness. In such cases, the BLM should take appropriate action so as not to allow the discretionary activity to rise to a level that would create an expectation of continued use, thereby impairing the suitability of the WSA for designation as wilderness.

6. Maintain improved conditions
FLPMA requires the BLM to manage all WSAs "so as not to impair the suitability of such areas for preservation as wilderness." If wilderness characteristics have improved since 1976 for a particular WSA (or, for Section 202 WSAs not reported to Congress, have improved since the date the WSA was designated), it is the policy of the BLM to not allow actions that would cause the regression of the WSA to its 1976 (or the designation date for Section 202 WSAs not reported to Congress) condition. For example, if primitive routes have been closed and rehabilitated, the BLM will not permit them to be re-established. The benchmark for the non- impairment standard is the condition in 1976 or current condition of the WSA, whichever is the better condition of wilderness characteristics.

C. The Non-Impairment Standard

1. Defining the non-impairment standard.
The BLM will review all proposals for uses and/or facilities within WSAs to ascertain whether the proposal would impair the suitability of the WSA for preservation as wilderness. Unless excepted under 1.6.C.2, all uses and/or facilities must meet the non-impairment standard (i.e. must be both temporary and not create surface disturbance), as described in the following detailed criteria:

a. The use or facility is temporary. The use or facility is needed for a defined time period to respond to a temporary need, and would be terminated and removed prior to or upon wilderness designation. A chronic, repeated short-term use does not meet this definition of "temporary." Uses, activities, or facilities that create a demand for uses that would be incompatible with wilderness management also do not meet the definition of temporary.

b. The use or facility will not create new surface disturbance. There is no new disruption of the rock, soil, or vegetation, including vegetative trampling, that would necessitate reclamation, rehabilitation, or restoration in order for the site to appear and function as it did prior to the disturbance. Uses or facilities that would require only passive natural restoration may still be considered surface disturbing. For example, cross-country vehicle use off boundary roads or existing primitive routes is surface disturbing because the tracks created by the vehicle leave depressions or ruts, compact the soils, and trample or compress

MS 6330 – Management of Wilderness Study Areas (P)

1- 10

vegetation. Landing fixed wing aircraft is considered surface disturbing unless it is on an existing airstrip or primitive route open to other motorized use (i.e. identified and documented to exist prior to passage of FLPMA). Certain activities allowed in wilderness areas, such as recreational hiking, use of pack stock, or domestic livestock grazing, are recognized as acceptable within a WSA, although, in the literal sense, they cause surface disturbance.

Management to the non-impairment standard does not mean that the lands will be managed as though they had already been designated as wilderness. Some uses that could not take place in a designated wilderness area may be permitted under the WSA Management Manual. For example, in many cases it is permissible use motorized vehicles on some primitive routes in WSAs, while such vehicles are prohibited in designated wilderness under the Wilderness Act.

2.  Exceptions to non-impairment
    There are seven classes of allowable exceptions to the non-impairment standard defined in section 1.6.C.1. When a use and/or facility that does not meet the non-impairment standard meets one of these exceptions, the BLM will endeavor to allow only the least impairing activities that facilitate the use and/or facility in order to avoid unnecessary impacts to wilderness characteristics. If an impairing proposed project—even one that meets an exception—can be implemented outside of a WSA and accomplish the objectives identified in the purpose and need statement prepared under NEPA, the BLM should endeavor to ensure that the project is implemented outside the WSA. Consult section 1.6.D for activity-specific guidance on the application of all exceptions.

    a.  Emergencies. In emergencies, any action necessary to prevent loss of life or property may be taken, even if the action will impair wilderness suitability. Emergencies include, but may not be limited to, fire, flood, pursuit of criminal suspects, search and rescue operations in cases of lost or injured persons, and recovery of deceased persons. To the extent possible, emergency actions will be conducted in the manner that least impairs wilderness suitability while resolving the emergency, and the resulting impacts will be restored as soon as possible after the situation has been resolved. See Section 2.3 of the BLM NEPA Handbook, H-1790-1, regarding NEPA compliance obligations for emergency actions.

    b.  Public safety. In addition to emergencies, the BLM may take actions that would otherwise violate the non-impairment standard to protect public safety. These actions are limited to remediation of human-caused hazards in the WSA (e.g., mine adits). In addition to correcting the public safety issue, the impacts of the hazard should be mitigated and the area restored, to the extent possible, as part of the authorized action. Altering naturally occurring hazards is not permissible. Since some human-caused hazards may be historic, compliance with the National Historic Preservation Act might be necessary (see section 1.6.D.1 of this manual). See also Section 2.3 and Appendix 5 of the BLM NEPA Handbook, H-1790-1, regarding NEPA compliance obligations for emergencies and actions relating to public health or safety.

MS 6330 – Management of Wilderness Study Areas (P)

c. <u>Restoration of impacts from violations and emergencies.</u> Human-caused impacts from violations and emergencies will be restored as soon as possible after they occur. All restoration should be to a level as close as possible to, or better than, that which existed at the site prior to the disturbance.

d. <u>Valid existing rights.</u> Any valid existing right (VER) existing on the date of approval of FLPMA (October 21, 1976)—or prior to the designation date for Section 202 WSAs not reported to Congress—will be recognized. Examples of VERs include: a valid mining claim, a mineral lease, or a right-of-way authorization (also see 1.6 D.4., Lands Actions, and D.5., Minerals). A validity exam must be conducted for mineral activities to verify valid existing rights. The scope of a VER is not unlimited; it depends upon any conditions, stipulations, or limitations stated in the law or approval document that created the right (e.g. if a lease contains a stipulation prohibiting surface occupancy, then the VER for that lease does not include the right to occupy the surface of the leasehold). If the holder of a VER transfers the claim, lease, or right-of-way authorization to another person, the same VER will be recognized for the new holder. However, a VER is tied to a particular location and cannot be transferred to a different claim, lease, or right-of-way location. The BLM should work with the holder of the VER to ensure that the non-impairment criteria are satisfied to the extent possible without unreasonably interfering with the exercise of the right. The BLM should evaluate the exact language of the instrument that conveyed or created the VER. If it is determined that the right conveyed can be exercised only through activities that will impair wilderness suitability, the activities will be regulated to the extent allowable to prevent unnecessary impacts to wilderness characteristics.

e. <u>Legacied uses.</u> Grazing, mining, and mineral leasing uses and facilities that were allowed on the date of approval of FLPMA (October 21, 1976)— or the designation date for Section 202 WSAs not reported to Congress —are allowed as a preexisting use and exempt from the non-impairment standard. As provided for in FLPMA Section 603(c), these uses and facilities may continue in the same manner and degree as on that date, even if this impairs wilderness suitability. As described in FLPMA, the only legacied uses include grazing, mining, and mineral leases, and do not include other uses such as recreational activities. The legacied uses may be acquired by a new operator, but cannot be transferred to a different location. The benchmark for the "manner and degree" of an existing use is the physical and visual impact that use was having on the area on October 21, 1976 (or the designation date for Section 202 WSAs not reported to Congress), because it is that impact that would have affected the wilderness review. Legacied activities allowed under the 1872 mining law allow for logical pace and progression of mining operations (see section 1.6.D.5.g of this manual).

f. <u>Protect or enhance wilderness characteristics or values.</u> As described in section 1.6.A.2 of this manual, Section 2(c) of the Wilderness Act of 1964 outlines the characteristics required of every wilderness. Actions that clearly benefit a WSA by protecting or enhancing these characteristics are allowable even if they are impairing, though they must still be carried out in the manner

MS 6330 – Management of Wilderness Study Areas (P)

1- 12

that is least disturbing to the site.

g. <u>Other legal requirements</u>. Activities required to meet obligations imposed by other laws are allowed even though they may violate the non-impairment standard. Such activities should, however, be carried out in the least impairing manner practicable. Many of these requirements are cited in this manual's section 1.6.D, Policies for Specific Activities, but other obligations may be created by Congress.

D. <u>Policies for Specific Activities</u>

This section includes policies to help answer common questions and provide examples related to specific activities that frequently take place in WSAs. Before using these policies, the guidance found in sections 1.6.A, 1.6.B, and 1.6.C must first be followed. Analysis of proposals and alternatives will be completed through the process in section 1.6.E. In all cases, management decisions should be guided by the principle that uses and/or facilities that would impair the suitability of all or part of a WSA for preservation as wilderness may not be authorized, unless they fit under an exception described in 1.6 C. 2. of this manual.

1. Cultural and paleontological resources

Cultural and paleontological resources, and the information they convey, are supplemental values and an important part of the wilderness characteristics of WSAs where they are found. Inventory, stabilization, rehabilitation, and research involving cultural or paleontological resources may be permitted if the activities satisfy the non-impairment criteria. Activities that clearly benefit the wilderness characteristics of a WSA by stabilizing, recovering, or recording important scientific data may be allowed and may require restoration.

2. Fire

a. <u>General</u>. This section of the manual cannot be used without incorporating standard agency fire management policies and techniques found in other BLM documents, such as the Guidance for Implementation of Federal Wildland Fire Management Policy, but not repeated here.

i. *Managing fire.* The overall goal of managing fire in WSAs is to allow the frequency and intensity of the natural fire regime to play its inherent role in the ecosystem. This means both allowing fire where ecosystems evolved in the presence of fire, and preventing unnatural spread of fire in ecosystems that evolved without broad-scale fires.

ii. *Biological constraints.* The overall goal may be affected by past human actions. These may include fire suppression leading to fuel buildup creating the possibility of unnaturally severe fires, or the invasion of non-native annual grasses leading to the unnatural spread of fire in ecosystems that evolved without broad-scale fires.

iii. *Management constraints.* The overall goal may be affected by budgets, national fire management demands, suppression of fire on adjacent land before it moves into the WSA, or undesired consequences of wildfire moving out of the WSA (such as wildfires that may pose a danger to human life and/or property).

MS 6330 – Management of Wilderness Study Areas (P)

1- 13

iv. *Terminology.* Changes in fire management terminology should not distract managers from applying the principles listed here. This manual will not be amended when fire terminology changes. The principles described here for fire management are more important than the exact words or acronyms being used.

b. <u>Wildfires.</u> These are unplanned ignitions or prescribed fires that subsequently are declared wildfires because they exceed the prescription parameters.

   i. *Management response.* The management response to a wildfire within a WSA may vary along a continuum from monitoring to suppression according to objectives outlined in the applicable Resource Management Plan (RMP) or Fire Management Plan (FMP) for the affected area. The response to a fire can change over the course of the event due to variations in weather, topography, fuels, and resources available. Managers will use a decision support process to guide and document wildfire management decisions. The process will provide situational assessment, analyze hazards and risk, define implementation actions, and document decisions and rationale for those decisions.

   ii. *Emergencies.* Wildfires can be considered emergencies and, as such, management response to a wildfire falls under one of the exceptions to the non-impairment criteria. Nevertheless, the non-impairment criteria will be met to the extent practical. This means using "minimum impact suppression tactics" or "light hand on the land" suppression techniques wherever possible, while providing for the safety of firefighters and the public and meeting fire management objectives.

   iii. *Suppression personnel.* Fire managers should inform suppression personnel during dispatch that the fire is in a WSA and that special constraints may apply to prevent impairment of wilderness characteristics. A fire resource advisor with experience in WSA management should be assigned to all fires in WSAs to assist in the protection of wilderness characteristics.

   iv. *Stabilization, rehabilitation, and restoration.* Emergency stabilization, rehabilitation, and restoration of the wilderness resource created by impacts from wildfires must satisfy the non-impairment criteria unless an exception applies. These activities will be more intensive:

      (a) where the effects of the fire were greater than would occur in an area where fire already plays its natural role on the landscape

      (b) in ecosystems that evolved without broad-scale fire

      (c) for fires whose effects (even within the natural range) pose an unacceptable risk to life, property, or resources outside the WSA

   Where wildfires have been managed for resource benefits, most stabilization, rehabilitation, and restoration activities are expected to be limited to the impacts caused by direct management actions or to prevent the spread of exotic vegetation. These activities will not be used to establish, or re-establish, conditions not provided for in sections 1.6.D.8 or 1.6.D.11 of this manual.

c. <u>Prescribed fires.</u> These are fires—otherwise known as "planned ignitions"— that are deliberately started by the BLM. The goal of prescribed fire is to make conditions

MS 6330 – Management of Wilderness Study Areas (P)

1- 14

possible for natural fire to return to the WSA. In some instances, the goal may be to mimic a natural fire regime where reliance on wildfire is not feasible.

   i. Use of prescribed fires in WSAs is limited to instances where this use meets the non-impairment standard or one of the exceptions, such as to clearly protect or enhance the land's wilderness characteristics. The BLM may utilize prescribed fire in WSAs where the natural role of fire cannot be returned solely by reliance on wildfire or where relying on wildfires might create unacceptable risks to life, property, or natural resources outside the WSA.

   ii. Prescribed fire planning for WSAs must take into account protection of cultural resources.

d. <u>Fuel treatment.</u> This includes thinning or removing vegetation, either mechanically or chemically, in advance of, or as a replacement for, wildland fire (either wildfire or prescribed fire). The goal of fuel treatment is to make conditions possible for natural wildfire to return to the WSA.

   i. *In advance of prescribed fire.* In some instances, fuel treatment may be necessary to protect site-specific resources in advance of a prescribed fire to prevent the loss of those resources. This necessity must be clearly demonstrated in the prescribed fire plan.

   ii. *Replacement for wildland fire.* Pre-fire treatment used to replace either type of wildland fire (sections b and c, above) is only allowed in WSAs where it meets the non-impairment standard or one of the exceptions. Due to their controversial nature and the complexities of analyzing the effects of these treatments on the non-impairment criteria, more extensive NEPA analysis (e.g. an EIS) including public involvement may be required when fuel treatments are proposed for use as a replacement for wildland fire. The policy in 1.6.D.8.b.iii must be satisfied. Fuel treatments *may* be permitted under the restoration or public safety exceptions to the non-impairment standard when:

      (a) prescribed fire in the WSA will inevitably cause unacceptable risks to life, property, or natural resources outside the WSA; or

      (b) natural successional processes have been disrupted by past human activity to the extent that intervention is necessary in order to return the ecosystem to a condition where natural process can function; or

      (c) non-native species have altered the fire regime so that wildland fires pose an undue risk to the native ecosystem.

   Conclusive documentation of (a), (b), or (c) above, must be included in the NEPA analysis of the proposed action. When fuel treatment is allowed, the BLM must strive to achieve the desired conditions through the least impacting method. Fuel treatments should not be authorized in a WSA if the same objectives can be accomplished by the BLM through fuel treatments on public lands outside of the WSA.

   iii. *Low-intensity Prescribed Fire.* Repeated low-intensity prescribed fires are preferable in most circumstances where pre-fire treatment is contemplated,

MS 6330 – Management of Wilderness Study Areas (P)

1- 15

even if this increases the time and cost of treatment.

3. Grazing management

   a. Livestock management developments.

      iv. *Pre-FLPMA livestock developments.* Livestock management developments existing or under construction on October 21, 1976 (or the designation date for Section 202 WSAs not reported to Congress), may continue to be used and maintained in the same manner and to the same degree as such use was being conducted on that date. In other words, they can have the same, but not more, physical or visual impact as they did at that time.

      v. *New livestock developments.* New livestock management developments may only be approved if they meet the non-impairment standard or one of the exceptions, such as protecting or enhancing wilderness characteristics. In determining whether a development meets the protecting or enhancing wilderness characteristics exception, the BLM will determine if the structure's benefits to the natural functioning of the ecosystem outweigh the increased presence of human developments and any loss of naturalness or outstanding recreational opportunities caused by the new development. Cumulative impacts must be assessed consistent with NEPA and implementing regulations, policy, and guidance. In addition, the BLM should consider whether or not the development will be substantially unnoticeable. The project must not require new motorized access since this would constitute surface disturbance and so would not meet the non-impairment standard. In order to allow new grazing development under the legacied use exception, there can be no increase in the AUMs existing prior to the new development as the result of any new permanent livestock management development.

   b. Livestock management activities.

      vi. *Salting.* For both legacied and non-legacied grazing operations, salting practices may occur. New salting locations may be established to improve the distribution of grazing use as long as the non-impairment criteria are met. (For example, no vegetation disturbance requiring restoration would occur at the new site).

      vii. *Supplemental feeding.* Supplemental feeding (e.g., minerals, vitamins, protein blocks or cubes, and high quality alfalfa) may be continued if it was allowed under the authorization that was in effect in 1976 (or the designation date for Section 202 WSAs not reported to Congress). No other supplemental feeding inside the WSA is allowed.

      viii. *Emergency feeding.* Temporary emergency feeding may be authorized by the BLM when forage becomes unavailable as a result of unforeseen natural events such as fire, flood, or heavy snowfall. Emergency feeding may only be allowed for short periods of time while the emergency exists and until the livestock can be removed.

      ix. *Vegetation treatments.* If vegetative manipulation was allowed under the authorization that was in effect in 1976 (or the designation date for Section

MS 6330 – Management of Wilderness Study Areas (P)

1- 16

202 WSAs not reported to Congress), the vegetative treatment may be maintained by reapplying the same or similar treatment as long as it does not create greater impacts and achieves the same objective. See D.8.b.iii below.

x. *Motor vehicle use.* Except as permitted by sub-sections 3.a and 3.b.iii, above, or as specifically authorized by the BLM, the use of motor vehicles or mechanical transport is restricted to those primitive routes in the WSA that are open to the general public.

c. Changes in grazing practices. As a legacied use, grazing management practices (e.g. level of use, season of use etc.) authorized during the 1976 grazing fee year (or prior to the designation date for Section 202 WSAs not reported to Congress), including levels of use, may not be changed solely because the use may impair a WSA's suitability for preservation as wilderness. Section 603(c) of FLPMA, provides for the continuation of grazing on lands under wilderness review, "[p]rovided that in managing the public lands, the BLM shall by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources or to afford environmental protection." If rangeland within a WSA is failing to achieve Rangeland Health Standards, the significant factors contributing to this failure will be determined through monitoring and a review of existing uses. If existing grazing management practices are found to be a significant factor in the failure to achieve standards, new grazing management practices may be established as needed if they meet the non-impairment standard or one of the exceptions. BLM Handbook H-4180-1 provides the process for ascertaining whether Rangeland Health Standards are being achieved and for determining causal factors when standards are not achieved. New grazing management is not a legacied use and in all cases may only be established if it meets the non-impairment standard or one of the exceptions.

The NEPA document that authorizes changes to grazing practices (see section 1.6.E of this manual) must evaluate, at a minimum, the following:

- watershed function
- ecological processes
- water quality
- habitat quality
- non-impairment of wilderness characteristics

i. *Grazing increases.* Grazing increases (increases in authorized grazing use) may be allowed if the impacts of such increases will meet the non-impairment standard or one of the exceptions. If the proposal meets the

MS 6330 – Management of Wilderness Study Areas (P)

1- 17

non-impairment standard or one of the exceptions a temporary non-renewable increase may be authorized. If the studies indicate the increase is causing impairment of the WSA's suitability for preservation as wilderness the increase will be reduced or discontinued.

ii. *Grazing reductions.* While there will be no reduction in grazing use levels due to impacts to wilderness characteristics, legacied grazing use is not necessarily frozen at the October 21, 1976 (or date of designation for a 202 WSA not reported to Congress) level, but may be subject to general BLM grazing management policy. As described above, if the rangeland is failing to achieve standards established by the BLM, the significant factors that contribute to those conditions should be ascertained and temporary or permanent reductions may be implemented as needed.

4. Lands actions: disposals, use authorizations, rights-of-way, access, and withdrawals

e. Disposals. Except as described below, public lands within WSAs may not be disposed of through any means, including public sales, exchanges, and patents under the Recreation and Public Purposes Act. Under either of the following two conditions, lands within WSAs may be subject to disposal:

i. Disposals may be permitted under normal BLM procedures for mining patents.

ii. Land exchanges involving public and non-Federal lands, can occur when the involved lands are within the same WSA, or when they are in two or more WSAs. These are unique situations, subject to prior approval by the BLM Director. The exchange must benefit wilderness values and/or improve wilderness management. Such exchanges may not result in the elimination of a wilderness characteristic, including supplemental values, of a WSA.

f. Use authorizations.

i. Any permit or lease issued under 43 CFR 2920 must contain a stipulation that if the WSA is designated as a wilderness area, the lease or permit may be terminated.

ii. Commercial filming may be permitted under 43 CFR 2920 if it is determined to meet the non-impairment standard or one of the exceptions. Commercial filming permits must stipulate that if the WSA is designated as a wilderness, the permit will be terminated.

g. Rights-of-way.

i. Existing rights-of-way may be renewed if they are still being used for their authorized purpose. When processing an application for renewal of an existing right-of-way, consistent with 43 CFR 2807.22(a) and 43 CFR 2887.12, the BLM should consider new, additional, or modified terms and conditions to minimize impacts to wilderness characteristics. Necessary, routine maintenance to keep an existing right-of-way facility in a safe and reliable condition, as well as any additional actions authorized in the original permit, may be permitted.

ii. Except as described under 1.6.D.4.d (Access) below, no new rights-of-way

MS 6330 – Management of Wilderness Study Areas (P)

1- 18

ill be approved for uses that do not satisfy the non-impairment standard.

h. <u>Access.</u>

    i. Where non-Federal lands are surrounded by WSA lands and an access route exists, a right-of-way authorization may be approved (as appropriate) under 43 CFR 2800 on the existing access. The right-of-way must not allow for any upgrading of the access route to a level greater than existed on October 21, 1976, or at the time of a Section 202 WSA's designation, nor allow use that would cause greater impact to the surrounding land or measureable degradation to the route. In cases where upgrading of the route would be necessary so that the owner may utilize the inholding for the purpose under which it was originally conveyed from Federal ownership (e.g., homestead patents), a right-of-way may be authorized, but must be limited so as to not cause impairment of wilderness characteristics (including such measures as may be necessary to limit the volume of vehicle traffic).

    ii. Where non-Federal lands are surrounded by WSA lands and no access routes exist, a right-of-way may be authorized to the extent that it meets the non-impairment standard or one of the exceptions. In cases where a right-of- way will be authorized under one of the exceptions, the BLM should select the route and specify the development allowable that causes the least impact to wilderness characteristics[1].

    iii. Where a right-of-way is authorized for access to an inholding, the BLM should consider authorizing the right-of-way for a limited period of time. For example, a right-of-way could be authorized for seasonal access only or limited to one or two years (with renewal being only at the discretion of the authorized officer). Such right-of ways must be terminated at the date of wilderness designation, if wilderness designation occurs. The Regional Solicitor must review all proposed rights-of-way prior to issuance. As an alternative to a potential access authorization, the possible acquisition of a non-Federal inholding via donation or purchase from a willing owner should be considered, consistent with land use plan decisions. In the event that Congress designates an area as wilderness, inholding access rights-of-way that expire upon the date of designation may be authorized by the BLM under CFR 2920 to ensure continued adequate and reasonable access to their inholdings.

i. <u>Withdrawals.</u> Unless a WSA or portion of a WSA was "previously withdrawn from appropriation under the mining laws, such lands shall continue to be subject to such appropriation during the period of review unless withdrawn by the Secretary under the procedures of section 204 of…[FLPMA]…for reasons other than preservation of their wilderness character." Existing withdrawals may be renewed if the withdrawal is still serving its purpose. No new withdrawals may be made except withdrawals that can

---

[1] This is a change from the 1995 manual, which stated that in all cases the BLM was required to provide reasonable access to inholdings. The 1995 direction, however, did not reflect the fact that reasonable access is only required in Alaska, under section 1323(b) of ANILCA. Because the provision of reasonable access does not apply to public lands managed by the BLM outside of Alaska, new access can only be provided to inholdings within WSAs outside of Alaska where it is consistent with FLPMA's non-impairment mandate.

MS 6330 – Management of Wilderness Study Areas (P)

1- 19

satisfy the non- impairment criteria.

5. Minerals

    a. <u>General.</u> The degree and types of development allowed for various mineral uses depend on the date of the mineral right or activity and the date associated with the WSA designation. For the purposes of this section:

        i. Legacied mineral uses are those that were either being carried out: a) prior to October 21, 1976, in any WSA submitted to Congress in the 1993 reports, b) prior to the date of designation for 202 WSAs not reported to Congress, or c) prior to the date of designation for any congressionally designated WSA. Legacied locatable and leasable mineral uses may continue in the same manner and degree in which they were being conducted on that date, even if they would impair wilderness suitability.

        ii. New mineral uses are those initiated after those respective dates. Valid existing rights (VERs) associated with mineral uses will be honored in WSAs. All reasonable efforts to meet the non-impairment criteria will be made as long as doing so does not unreasonably interfere with the VER. Absent a VER, new mineral uses are allowed only to the extent that wilderness characteristics are not impaired and, consequently, the non-impairment criteria are satisfied.

    b. <u>Disposal of mineral materials (saleable minerals).</u> Mineral materials subject to disposal include, but are not limited to, petrified wood and common varieties of sand, stone, gravel, pumice, and clay.

        i. Except as provided for in ii, below, sale or free use of all mineral materials is not allowed because such activities cause surface disturbance and so do not meet the non-impairment criteria.

        ii. Free collection of small amounts of mineral materials for personal use may be permitted except:

            (a) all collection must satisfy the non-impairment criteria

            (b) no collection of petrified wood is allowed in areas where it has been identified as a supplemental value of the WSA (except under scientific permit; see 1.6.D.1).

    c. <u>Oil and gas (leasable minerals).</u> For the purposes of this section, these resources include oil shale and tar sands.

        i. New leasing of oil and gas minerals, including leasing with "no surface occupancy" stipulations, is prohibited within WSAs under the Federal Onshore Oil and Gas Leasing Reform Act of 1987 (30 U.S.C. § 181). This includes split-estate lands within the boundary of the WSA where Federal mineral estate underlies non-Federal surface. The BLM may offer lands for lease up to the WSA boundary. However, where the exact legal description of the WSA boundary is not known due to the lack of an official survey, leasing should be set back from the WSA boundary. The setback distance will be determined by the manager, through the Management of Land Boundaries Plan where it exists, and be sufficient to guarantee that wilderness characteristics of the lands within the WSA boundary are not

MS 6330 – Management of Wilderness Study Areas (P)

1- 20

impaired.

ii. Pre-existing mineral leases will be allowed to be developed according to the VER conveyed by the specific terms and conditions of each lease. These rights are neither absolute nor unqualified, but do include the right to access different leasable mineral horizons than were being tapped at the time of WSA designation unless the lease specifies otherwise. Activities for the use and development of such leases must satisfy the non-impairment criteria, unless this would unreasonably interfere with rights set forth in the mineral lease. Development of pre-existing leases may be subject to terms and conditions to minimize impairment of wilderness characteristics, including:

(a) use of best management practices. These may include: relocation of operations of up to (or beyond, if identified and applied through additional NEPA analysis) 200 meters or modification of the facility design (e.g., shaping the road and well pad to minimize cut and fill, or requiring no blading of access route or well pad if conditions allow; requiring low-profile equipment, pitless (closed system) drilling, engine mufflers, telemetric controls, interim reclamation to the wellhead and road surface, liquids gathering systems to offsite production facilities, and final reclamation restoring the landform and native vegetation).

(b) standard practices such as blading or gravelling well pads or access routes may be suspended until a well is proven productive.

(c) if there is no legal access to a pre-existing lease, and that lease is entirely within a WSA and not contiguous with any part of the WSA boundary, the lease may not be developable since: 1) rights of access across a lease do not include rights of access to the lease; 2) such rights of access to a lease must come in a separate right-of-way authorization; and 3) no new rights-of-way will be issued in WSAs for uses that do not meet the non- impairment criteria or exceptions described in this manual.

(d) on leases that cross the boundary of a WSA, the lease rights may be satisfied without allowing drilling in the WSA, depending on the proportion of the leasehold within the WSA.

iii. Suspension of lease terms may be requested by lease holders if an application to conduct operations is denied because of the potential impairment of wilderness suitability as outlined in paragraphs ii.B or ii.D, above. The Secretary of the Interior has the discretionary authority to direct or assent to such a suspension of the operating or producing requirements of a lease if it is in the interest of conservation to do so and when the specific circumstances involved warrant such an action, such as until congressional decision on the wilderness status of the area is made.

iv. Geophysical exploration may be allowed only if it satisfies the non-impairment criteria.

v. Drilling units may include existing leases, but those leases are constrained in their valid existing rights as described above. The rights of leases

MS 6330 – Management of Wilderness Study Areas (P)

1- 21

outside the WSA not subject to the non-impairment criteria cannot be extended to leases within the WSA through formation of a drilling unit, though leases within the WSA enjoy other benefits of unitization and their terms may be continued by drilling, or extended by production, on other leases in the unit.

d.  Geothermal resources. These include geothermal heat, steam, hot water, and hot brines, including those resulting from artificially introducing fluids into geothermal formations. To the extent applicable, the policies for managing geothermal resources in a WSA are identical to those for managing oil and gas resources. See also 43 CFR 3200.

e.  Coal. Except where specifically noted, all provisions apply to both underground or surface mining of coal reserves. See also 43 CFR 3400.
   i.  New leasing of coal is prohibited within WSAs.
   ii.  Pre-existing coal leases will be allowed to be developed according to the VER conveyed by the specific terms and conditions of each lease.
   iii.  Pre-existing Preference Right Lease Applications (PRLAs) will be adjudicated by applying the criterion for assessing lands unsuitable for coal mining at 43 CFR 3461.5(d)(1). Therefore, even though the applicant showed a pre-existing commercial discovery of coal, WSAs are considered unsuitable unless and until congressional decision not to designate the WSA as wilderness and to release it from further review. The Secretary may initiate exchange proceedings under 43 CFR 3430.5-4.
   iv.  Coal exploration licenses may be allowed only if they satisfy the non-impairment criteria.

f.  Other leasable minerals. These include phosphate, potassium, sodium, sulfur, and uintaite or other vein-type solid hydrocarbons. To the extent applicable, the policies for managing these resources in a WSA are identical to those for managing oil and gas resources. See also 43 CFR 3500.
   i.  Preference Right Lease Applications (PRLAs) will be recognized, if in conformance with the terms set forth in 43 CFR 3507. However, conditions will be imposed in such leases to prevent impairment of the area's suitability for preservation as wilderness. Therefore, development of an area under a PRLA will be deferred until congressional decision not to designate the WSA as wilderness and to release it from further review.

g.  Mining operations under the 1872 Mining Law (locatable minerals). In addition to provisions in 43 CFR 3700 and 3800, these activities are managed according to 43 CFR 3802. This section of the Code of Federal Regulations must be consulted in the management of mining operations subject to the 1872 Mining Law. For WSAs established under the authority of Section 202 of FLPMA, location, subsequent assessment, and mining operations under the 1872 Mining Law are exempt from the non-impairment standard, but still must satisfy the BLM's standard of preventing unnecessary or undue degradation.
   i.  Exploration, Prospecting, and Location of New Mining Claims are permitted in all WSAs unless withdrawn under other provisions of law. For

MS 6330 – Management of Wilderness Study Areas (P)

1- 22

WSAs established under the authority of Section 603 of FLPMA, all new location, methods and routes of access, and subsequent assessment must satisfy the non-impairment criteria.

ii.  Mining on pre-existing claims may occur. The degree to which impairing activity, including assessment work, is allowed depends on whether the mining claimant is recognized as having a "valid" discovery as of October 21, 1976.

(a) Mining claimants are recognized as having a VER if a valid discovery was made on the claim on or before October 21, 1976, and the claim continues to be supported by such a discovery. A validity exam performed by BLM, as described in BLM Manual 3812, Validity Examinations, determines whether or not a valid discovery exists. When it is determined that the claimant's rights can be exercised only through activities that will impair wilderness suitability, they will be allowed to proceed, the impairment notwithstanding. Claims that do not meet the standards of a VER may still be developed as an allowed, legacied use if they fit the appropriate criteria (see ii.B, below).

(b) Access to claims that meet the requirements of a VER is permitted, even if it fails to meet the non-impairment standard. Such access must still not cause unnecessary and undue degradation.

(c) Pre-existing mining operations that do not satisfy the requirements of having a VER nevertheless are permitted to continue in the "same manner and degree" as were occurring in October 1976 as legacied uses. In practical terms:

(i) The same physical and visual impacts are allowed to continue at a logical pace and progression, provided that the impacts of the extension or of the new activity are not of a significantly different kind than the impacts existing on October 21, 1976.

(ii) The quantity of on-the-ground impacts may be increased by the logical pace and progression of a legacied use, but the new impacts may not be of a significantly different kind than the impacts involved with the pre-FLPMA activity.

(iii) It is the use, rather than the claim, that is exempt. A legacied mineral use may continue in the same manner and degree onto adjacent claims held by the same person, even if the adjacent claims are post- FLPMA claims.

(iv) IV. Access to claims that do not meet the requirements of a VER is limited to the "same manner and degree" that existed on October 21, 1976.

(d) Work on pre-existing mining claims that do not satisfy the definitions of either VERs or legacied uses will be allowed only

MS 6330 – Management of Wilderness Study Areas (P)

1- 23

   if the BLM determines that the proposed operations satisfy the non-impairment criteria.

  (e) Because Congress directed the BLM to stop patenting mineral claims in 1994, that process is not discussed here.  If patenting were to resume, this sub-section of the WSA Management Manual will be revised. Patented claims issued prior to 1994 are treated as private land except in the California Desert Conservation Area, where patented claims continue to be regulated to prevent unnecessary or undue degradation.

6. Recreation

  a. General. Most recreational activities (including hiking, horseback riding, fishing, hunting and trapping, camping, and other primitive forms of recreation) are allowed on WSAs.  However, some activities may be prohibited or restricted if they do not meet the non-impairment standard or one of the exceptions.  Examples of recreational use activities that would be found to impair, and so could not be allowed unless they meet one of the exceptions, include those that require permanent structures or depend upon cross-country use of motor vehicles or mechanical transport (for example: pickup vehicles for balloons or sailplanes).

The BLM will monitor the magnitude of all recreational activities in WSAs to ensure that such use will not impair the area's wilderness suitability.  If monitoring indicates impairment is occurring the BLM will, as appropriate and subject to applicable law, take action to eliminate the impairing activity (e.g., adjust the time, location, or quantity of use, or prohibit that use in the impacted area).  For example, an area may become more frequently used for camping, thereby causing broad physical impacts to soils or vegetation, or an area may become popular for mountain biking, and the resulting increase in use results in a loss of solitude.  In either case, the BLM must take some action to address the impairment of wilderness characteristics.

Care must be taken not to concentrate use by promoting a recreational activity that is normally allowable but at high use levels would cause impairment or create a conflict that may constrain Congress' ability to designate the area as wilderness.

  b. Motorized/Mechanical Transport.

   i. Recreational use of motor vehicles or mechanical transport (see Glossary) may only be allowed when such use is consistent with all applicable laws and meets the non-impairment standard.  The following are examples of motorized or mechanized transport uses that are not likely to impair an area's suitability and therefore may be allowed in a WSA:

    (a) within "open" areas designated prior to the passage of FLPMA (October 21, 1976), unless the area was subsequently limited or closed in a Land Use Plan decision.

    (b) on primitive routes (or "ways") identified by the BLM as existing on October 21, 1976 (or prior to the designation date for Section 202 WSAs not reported to Congress) if:

     (v) identified in the original wilderness inventory; or

MS 6330 – Management of Wilderness Study Areas (P)

1- 24

        (vi) if not identified as in I., having documented proof that the route existed at that time; and

        (vii)     whether I. or II., the route was not otherwise closed through BLM's Travel Management Planning

    (c) off of primitive routes for the minimum clearance to allow another vehicle to pass when driving or parking vehicles.

Note: offices may consider issuing supplementary rules where necessary to provide enforcement of this section of the WSA Management Manual.

i.    Because their development causes new surface disturbance, no new motor vehicle or mechanical transport routes will be permitted in WSAs. Vehicle routes other than those defined in b.i.B, above, should be closed and restored.

ii.    No improvement or maintenance of any primitive routes will be permitted to facilitate recreational motor vehicle or mechanized vehicle use in WSAs if it does not meet the non-impairment standard or one of the exceptions.

iii.    Primitive routes within WSAs may only be used to the extent that the physical impacts of the primitive route are no greater than existed on October 21, 1976 (or prior to the designation date for Section 202 WSAs not reported to Congress). During the wilderness inventory, the BLM evaluated all "ways" (now referred to as "primitive routes") within WSAs and in many cases established photo documentation of their condition.  Except for emergency situations as defined in section 1.6.C.2.a, or for activities authorized under other exceptions to the non-impairment criteria in section 1.6.C.2., the BLM must take action to ensure the route does not exceed the approximate conditions of impact to the wilderness characteristics that existed on October 21, 1976 (or prior to the designation date for Section 202 WSAs not reported to Congress). Actions taken to improve the wilderness characteristics of the route will impose the least restrictions on visitors while effectively restoring the route, and can include closure (seasonally or year- round) of primitive routes to some or all types of motorized or mechanical transport under the authorities of 43 CFR 8341.2 and 8364 where:

    (a) Use has increased appreciably, causing the route to become more highly developed (for example, a two track route that no longer has center vegetation or has increased in width).

    (b) Deterioration of the route has occurred, causing drivers to bypass a section(s) of the route (for example, the surface of a primitive route has eroded causing drivers to bypass the original route and drive parallel to it).

    In most cases, closure of primitive routes will also include restoration of the soil and vegetation.  In some cases, a closure may be made by gating the road and allowing for authorized use to continue (for example, access associated with grazing administration).

iv.    If outstanding opportunities for solitude were identified in the original inventory, the BLM will monitor remaining primitive routes open to motorized travel within the area and take actions to prevent the impairment of

MS 6330 – Management of Wilderness Study Areas (P)

1- 25

the opportunity for solitude.  The BLM cannot allow use (including increased vehicle use on routes remaining open to motorized or mechanical transport within the area) that would impair these opportunities.

v.  As described in BLM Manual 1626—Travel and Transportation Manual, "Any motorized/mechanized linear transportation feature located within [WSAs] will be identified in a transportation inventory as a motorized/mechanized 'primitive route'...Primitive routes will not be made a part of the transportation system, classified as a transportation asset, or entered into the Facility Asset Management System (FAMS) unless one of the following conditions is met:

> (a) The routes are designated as non-motorized and non-mechanized trails, or
>
> (b) Congress releases the WSA from Wilderness consideration."
>
> Motorized/mechanized primitive routes may be signed only to the extent necessary to prevent resource damage or users getting lost; they may not be assigned names or numbers that would appear to create a *de facto* route system.

vi.  Though motorized and mechanical transport may be permitted to continue along existing primitive routes, "closed" designations may be appropriate for WSAs, or portions of WSAs, where RMP planning goals are to provide primitive recreational opportunities, or where needed for the protection of an identified natural resource.

c.  <u>Trails.</u>  As surface disturbing developments, no new trails or related structures or installations will be allowed, unless they meet an exception to the non-impairment standard. Where trails are allowed under an exception, no motorized or mechanical transport (e.g. bicycles) will be allowed on such trails.

If found to meet the non-impairment standard or one of the exceptions, new trail sections, trail structures, or installations may be provided under the following conditions:

i.  Hiking or horseback riding use levels have increased, or are expected to increase, to the extent that resource impacts are or are likely to become present (e.g. braided or duplicate trails, impacts to cultural sites or other sensitive resources, or accelerated soil erosion).  In these cases, to minimize recreational use impacts to wilderness characteristics a single, properly located, sustainable trail may be provided for under the "restoration of impacts from violations emergencies" or "protect or enhance wilderness characteristics or values" exceptions to the non-impairment criteria (see sections 1.6.C.2.c and 1.6.C.2.f.)

ii.  Hiking or horseback riding use levels have increased so that a defined route is present, and the route leads visitors to a hazard (e.g. along a precipitous ledge or to an abandoned mine). In these cases, a trail may be relocated to a more appropriate location.

iii.  A primitive route closed to motor vehicles is utilized by hiking or

MS 6330 – Management of Wilderness Study Areas (P)

1- 26

horseback riding. The primitive route may be managed as a trail, including constructing water drainage and re-routing of unsustainable sections as defined in c.i and c.ii, above.

d. Boating. Boating may be allowed with or without motors as long as supporting facilities and activities within the WSA satisfy the non-impairment criteria. No launching ramps or boat docks will be built. A "brow log" may be used to reduce erosion at boat landings. A short trail may be designated and maintained between boat landings and campsites at appropriate locations above the waterline in order to minimize recreational use impacts to the wilderness resource consistent with paragraph 6.c, above. Impacts to shoreline campsites will be monitored.

No waters will be closed to motorboats solely because they are in WSAs. However, if the impact of motor boating (such as shore erosion or water pollution) is found to impair the area's suitability for preservation as wilderness, the BLM must limit or close motor boating or otherwise mitigate these impacts.

e. Skiing. Skiing is allowed as long as all supporting facilities and activities within the WSA satisfy the non-impairment criteria.

f. Aerial activities. Aerial activities such as ballooning, hang gliding, paragliding and parachuting (sky diving), may be allowed as long as they meet the non-impairment standard, including not requiring cross-country use of motorized vehicles or mechanical devices to retrieve equipment, except in areas designated as "open" before October 21, 1976.

g. Rock climbing and caving. Rock climbing and caving are allowed as long as these activities meet the non-impairment criteria. The placement of permanent fixed anchors (e.g., bolts) or artificial holds is not allowed unless it meets one of the exceptions to the non-impairment standard, e.g. for emergencies, such as search and rescue operations. Any impacts from emergency actions must be restored to a substantially unnoticeable condition following the emergency situation. Generally, fixed anchors placed prior to FLPMA will not be removed unless their presence creates—directly or indirectly—impacts that exceed the non-impairment standard.

h. Camping. Camping is generally allowed in WSAs. Primitive camping (i.e., horse camping and backpacking) may occur anywhere in the WSA as long as it meets the non-impairment criteria. Campsites should be monitored and action taken to limit use and/or restore sites where unacceptable levels of impact are present. Low impact camping techniques should be promoted within all WSAs.

Campsite developments (e.g. camping pads, picnic tables, etc.) may not be installed. Toilets may only be provided to protect or enhance wilderness characteristics where resource damage is documented and where the toilet would not rely on motor vehicles for maintenance. Camping with motor vehicles may occur on existing primitive routes as long as this use meets the

MS 6330 – Management of Wilderness Study Areas (P)

1- 27

non-impairment criteria. Vehicles may drive off of existing primitive routes no farther than is necessary to allow another vehicle to pass. In some cases, camping spurs were documented in the route analysis during the wilderness inventory; these may continue to be used as long as vehicles cause no more impact than was present at the time of the inventory.

i. <u>Education and interpretation.</u> Environmental education and interpretive programs may be conducted as long as they meet the non-impairment standard or one of the exceptions.

j. <u>Hobby collecting.</u> Hobby collecting of common rock and mineral specimens (rock hounding) and vegetative specimens may be allowed for personal but not commercial use, as long as the collection activity method meets the non-impairment criteria and is not otherwise prohibited. Collecting common invertebrate and plant paleontological resources as allowed under the Paleontological Resources Protection subtitle of 16 U.S.C. 7202 will not be allowed in a WSA where these non-renewable resources have been identified as a supplemental value because said use would impair the area's suitability for preservation as wilderness. See also 1.6.D.5.b.ii in this manual. As on any public land, no hobby collecting of any resource protected by the Archaeological Resources Protection Act is permitted.

k. <u>Gold panning.</u> Recreational gold panning, when conducted without location of a mining claim, may be allowed as long as it is done in a manner that satisfies the non-impairment criteria. If the activity would cause noticeable damage to fish spawning or rearing areas, it will be considered to impair wilderness suitability, and the activity will be limited to prevent such impairment. Dredging is not allowed unless it meets one of the exceptions to the non-impairment standard.

l. <u>Geocaching.</u> Geocaching and other similar activities are allowed as long as the use meets the non-impairment criteria. The BLM must also ensure that activities that would be incompatible with wilderness designation (such as geocaching with physical caches) do not become the dominant use of the area, thereby impairing the solitude or primitive recreational opportunities that existed at the passage of FLPMA. See section 1.6.B.5. The BLM should coordinate with geocachers to ensure that caches are not placed in areas with sensitive resources (e.g. cultural). Where increased use levels are found to be causing impairment (e.g. new visitor created trails or soil and vegetation impacts around the geocache site) geocaching should be discontinued

m. <u>Special recreation permits.</u> Activities that require authorization under a Special Recreation Permit (SRP) will be allowed only if the use and related facilities satisfy the non-impairment criteria (and therefore do not involve a use of the WSA that would be incompatible with wilderness designation). Examples of uses that may be authorized include river trip outfitters, hunting or fishing guides, group backpack trips, and providers of pack animals and saddle horses.

MS 6330 – Management of Wilderness Study Areas (P)

1- 28

7.  Soil, water, air

  a.  <u>Direction from FLPMA on Soil, Water, and Air.</u> Section 102 of FLPMA sets
      forth Congress' declaration of policy that "the public lands be managed in a
      manner that will protect the quality of scientific, scenic, historical, ecological,
      environmental, air and atmospheric, water resource, and archeological values."
      While air is not within the definition of public lands, the BLM must manage the
      public lands in a manner that will protect the quality of air values.  FLPMA
      more specifically directs that the management of the public lands be on the
      basis of multiple use and sustained yield unless otherwise specified by law.  In
      developing and revising land use plans, FLPMA requires BLM, among other
      things, to "provide for compliance with applicable pollution control laws, including
      State and Federal air, water, noise, of other pollution standards or implementation
      plans."

  b.  <u>Monitoring devices.</u>  Temporary and permanent monitoring markers,
      instruments, meteorological devices, soil pits, snow gauges, and water quantity
      and quality measuring instruments may be established where needed to monitor
      threats to human health, safety, or property or to monitor a WSA's natural
      resources in order to support restoration or prevent impairment.  Such devices
      will only be allowed if they meet the non-impairment standard or one of the
      exceptions.

  c.  <u>Watershed rehabilitation.</u>  Measures required for watershed rehabilitation may
      be permitted if they satisfy the non-impairment criteria or one of the
      exceptions. Watershed rehabilitation activities to address natural successional
      processes that have been disrupted by past human activity may be allowed.
      Intervention will be limited to what is necessary to allow the system to return
      to a natural process and to what is necessary to address situations where
      stabilization through natural processes would take longer than one growing
      season and the impacted area would be susceptible to significant soil loss
      during that time or further ecological departure would occur. (See also section
      1.6.D.8).  Approaches that do not restore natural processes should not be
      approved.

  d.  <u>Clean Air Act.</u> FLPMA requires the BLM to protect the quality of air and
      atmospheric values, while managing the public lands according to "multiple
      use" and "sustained yield" principles. FLPMA also requires that the BLM's
      land use plans provide for compliance with applicable air pollution standards or
      implementation plans.  Under the Clean Air Act Prevention of Significant
      Deterioration (PSD) program, most WSAs are designated as "Class II" areas. This
      allows moderate deterioration associated with moderate, well-controlled industrial and
      population growth. The BLM will continue to manage WSAs consistent with FLPMA
      and the Clean Air Act requirements for Class II areas, unless an area is redesignated

MS 6330 – Management of Wilderness Study Areas (P)

1- 29

as "Class I" (a designation that requires greater protection) by the appropriate State through procedures under the Clean Air Act.

8.  Vegetation

a.  <u>General.</u> Whenever possible, natural processes will be relied on to maintain native vegetation and to influence natural fluctuations in populations. Natural disturbance processes, including fire, insect outbreaks, and droughts, are important functions of the ecosystem. Manipulation of vegetation through management-ignited fire, chemical application, mechanical treatment, or human controlled biological means is allowed only where it meets the non-impairment standard or one of the exceptions. Exceptions that may pertain to vegetative treatment include emergencies, the protection or enhancement of wilderness characteristics, legacied uses (refer to Glossary), valid existing rights, and actions taken to recover a federally listed threatened, endangered, or candidate species. Establishing non-native plants is an example of vegetation management that may impair and therefore may not be permitted within a WSA.

b.  <u>Vegetation management.</u>

i.  *Emergencies.* As an exception to the non-impairment standard, vegetative manipulation in emergency situations may be allowed, e.g. there is no effective alternative for controlling insect and disease outbreaks or fires that threaten lands outside of a WSA. Reseeding or planting of native species may be undertaken following fire or other natural disaster if natural seed sources are not adequate to compete with non-native vegetation or substantial soil loss is expected.

ii.  *Insect and disease control.* Native insect and disease control activities on vegetation will be allowed only to the extent that they meet the non- impairment criteria or one of the exceptions. When specific insects and diseases are documented to be non-native or introduced organisms, then it may be reasonable to consider whether the protection and enhancement of wilderness characteristics exception to the non-impairment standard applies.

iii.  *Restoration.*

(a) General.  There are three primary types of restoration:

(i) <u>Site-specific disturbances</u>. Restoration of human impacts, authorized disturbances, or violations normally includes treatments to restore the appearance of site-specific areas and to promote regrowth of native vegetation on the disturbed

MS 6330 – Management of Wilderness Study Areas (P)

1- 30

site.

(ii) <u>Control of non-native vegetation</u>.  Non-native vegetation that interferes, or has the potential to interfere, with ecosystem processes or function (e.g. non-native annual grasses), or illegally cultivated plants (e.g. marijuana), may be controlled using the method or combination of methods known to be effective, while causing the least damage to non-target species.  Reseeding or planting of native species may be done following weed treatment and fire or other natural disaster as needed where natural seeding is not adequate and to prevent non-native vegetation from becoming dominant.

(iii) <u>Broad-scale landscape function</u>.  The vegetation of some of the landscapes in which WSAs are located has undergone intentional and unintentional human caused transformation during the modern industrialized era.  In some cases, these activities have resulted in a departure from the natural composition, structure, and density of native species, with impacts to habitat quality, soil stability, and watershed function.

(b) Where it meets the non-impairment standard or one of the exceptions, management action may be taken to restore vegetation to characteristic conditions of the ecological zone in which the area is situated where:

(i) natural successional processes have been disrupted by past human activity, to the extent that intervention is necessary in order to return the ecosystem to a condition where natural process can function;

(ii) restoration through natural processes would require lengthy periods of time during which the impacted area would receive unwanted human use or be susceptible to significant soil loss without intervention, or further ecological departure would occur; or,

(iii) it is necessary to maintain fire-dependent ecosystems when adjacent land uses do not allow for natural fire occurrence. (see section 1.6.D.2.c)

(c) Manipulation should only occur when restoration by natural forces is no longer attainable, and only to restore or maintain vegetative communities to the closest approximation of the natural range of

MS 6330 – Management of Wilderness Study Areas (P)

conditions.

(d) Restoration treatments should use the least disruptive techniques that have the best likelihood for success. Patient, incremental treatments should be favored over aggressive attempts to restore long-term changes all at once, unless repeated treatments would pose greater impairment risk to wilderness characteristics.

(e) Monitoring programs must be in place prior to treatment and must be sufficient to evaluate responses of key ecosystem components and processes at multiple scales.

(f) Restoration projects are based on landscape assessments that identify historical range of variability, current condition, restoration targets, and cumulative effects of management. The decision to manipulate an ecosystem must be based upon clearly articulated, well-supported management objectives and available scientific information. At a minimum, the EA or EIS for any proposed manipulation of vegetation must address the following:

- A description based on historical and scientific evidence of the natural vegetative community and processes that would have existed prior to the effects of industrialized humans.

- A description of the existing condition and how it is a departure from the natural vegetative community and processes.

- Evidence from existing research/application that the proposed treatment will bring about the desired result.

- An evaluation of the likelihood of the natural system to be self- sustaining after the treatment. Treatments should allow for natural processes to resume. Where this is not possible because of conditions outside the WSA (e.g. a fire regime influenced by adjacent private land development), the contributing conditions and factors must be described.

c. Collection and removal. Collection of seeds, nuts, berries, and similar items for personal use may be permitted, as may the collection of firewood for recreational use while recreating in the WSA as such uses are generally not found to impair the area's suitability for preservation as wilderness. Commercial or agency seed or plant collection may be permitted in support

of restoration as described in section 8.b.iii, above, or for other restoration or scientific purposes as long as the non-impairment standard or one of the exceptions is met. Collection activities must be conducted in a non-impairing manner. Forest product removal, including building material, fuelwood, Christmas trees, and boughs, may not permitted as these activities are generally found to impair, with the exception of forest products resulting from stewardship contracts for restoration activities (1.6.D.8.b.ii.) in which vegetative products become the property of the contractor.

9. Visual resources management

All WSAs should be managed according to VRM Class I management objectives until such time as Congress decides to designate the area as wilderness or release it for other uses.

10. Wild horse and burro management

a. <u>General.</u> Wild horse and burro herds are managed in WSAs only within geographic areas identified as having been used by a herd as its habitat in 1971 as directed by the Wild Free-Roaming Horse and Burro Act. Wild horses and burros are managed to remain in balance with the productive capacity of the habitat; this includes managing herds so as not to impair wilderness characteristics. Wild horse and burro populations must be managed at appropriate management levels so as to not exceed the productive capacity of the habitat (as determined by available science and monitoring activities), to ensure a thriving natural ecological balance, and to prevent impairment of wilderness characteristics, watershed function, and ecological processes. The BLM should limit population growth or remove excess animals as necessary to prevent the impairment of the WSA.

b. <u>Existing wild horse and burro developments.</u> Existing wild horse and burro developments within WSAs may continue to be utilized and maintained.

c. <u>New wild horse and burro developments.</u> Proposed new facilities and their potential impacts must be evaluated in conformance with NEPA (see section 1.6.E). If a portion of the Herd Management Area (HMA) is outside the WSA, any new development should be placed there, where practicable.

i. *Water developments.* As surface disturbing developments, new water sources for wild horse or burro herds can only be allowed where they meet one of the exceptions to the non-impairment standard. Water developments that are incorporated into the protection of springs or riparian areas (including water developments created to replace water lost elsewhere in the HMA)

MS 6330 – Management of Wilderness Study Areas (P)

1- 33

may be permitted if they meet an exception to the non-impairment standard.

ii. *Fences*. New fences may be allowed where necessary to protect springs or other water sources from impairment by wild horses or burros. Such exclosure fences must be visually minimized and large enough to avoid making native animals susceptible to predation.

iii. *Traps*. Traps for the removal of excess wild horses or burros must be located outside of WSAs whenever possible. When practical alternatives do not exist, temporary traps may be located within WSAs for the effective removal of animals in excess of the appropriate management level established for the herd area. Traps must be situated to minimize impacts to vegetation and soils. Vehicles necessary for set-up and take-down of traps and for transporting excess wild horses and burros away from the area may be driven off of existing primitive routes or boundary roads on a route specified through the NEPA analysis. At the completion of the gather, all facilities must be removed, the route used for trap access closed to motor vehicles until it is restored to the original condition, and any new access route and trap area rehabilitated so that the route is no longer visible to subsequent motor vehicle operators.

iv. *Motor vehicles and aircraft*. Except as authorized for establishing a trap in b.iii, above, motor vehicles may not drive off open primitive routes and roads if doing so does not meet one of the exceptions to the non-impairment standard. Helicopters and fixed wing aircraft may be used for aerial surveys and for the gathering of wild horses and burros.

11. Wildlife.

a. <u>Coordination between the BLM and state agencies.</u> Congress directed the Secretary, through the BLM, to manage WSAs "in a manner so as not to impair the suitability of such areas for preservation as wilderness." However, effective management of WSAs requires close coordination and communication between the BLM and State wildlife management agencies. "In general the States possess broad trustee and police powers over fish and wildlife within their borders, including fish and wildlife found on Federal lands within a State." (43 CFR 24.3). Management actions taken to support wildlife management, whether proposed by the State or the BLM, must conform to the non- impairment mandate, as detailed in 1.6.C of this manual.

MS 6330 – Management of Wilderness Study Areas (P)

1- 34

To facilitate BLM/State coordination, each BLM State Office should maintain effective communication and coordination with their State wildlife management agency counterparts. The BLM should seek to establish MOUs with the relevant state wildlife agencies to identify any state-specific management activities, policies, and/or procedures that may involve WSAs and to determine under what conditions State fish and wildlife activities will be conducted in WSAs. Such MOUs, as well as fish and wildlife management actions undertaken by the BLM and not involving the State agency, will include the provisions described in the following sub-sections. For all actions, the BLM will ensure that the non-impairment criteria are met, or that one of the exceptions to non-impairment applies. (See section 1.6.C of this manual.) It is the expectation that the BLM will work closely with the state agency in consideration of all project proposals involving WSAs. When a project is under consideration BLM will conduct a non-impairment analysis and assist stateagencies in designing the project to conform with the non-impairment standard. Projects will be subject to NEPA analysis as appropriate.

States regulate where and when the activities of hunting, fishing, and trapping take place in WSAs. Hunting, fishing, and trapping are normally unaffected by WSA designation. The BLM is responsible for managing the habitat upon which these fish and wildlife are dependent. In WSAs, the BLM has an additional responsibility to assure that management techniques and tools do not cause impairment to wilderness characteristics and that fish and wildlife management activities emphasize the continuation of natural processes to the greatest extent possible.

b. General. Wildlife and their habitat in WSAs are managed to ensure:

- natural distribution, number, and interaction of native species
- natural processes will be allowed to occur under the applicable land use plan unless degrading to other wilderness characteristics
- wildlife species maintain a natural balance with their habitat and with each other

If healthy, viable, self-sustaining populations of native species presently exist within the WSA, then a natural distribution, number, and interaction has already been achieved, and it is generally not appropriate to artificially manipulate natural processes to increase the population of a native species. Exceptions to this general rule are specified below.

(Note: nothing in this section applies to Wild Horses and Burros -- see section 1.6.D.10.)

c. Permanent structures and installations. Permanent facilities used in wildlife

MS 6330 – Management of Wilderness Study Areas (P)

1- 35

management include guzzlers, water tanks, and exclosure fences. These structures or installations are considered either "existing" or "new."

i.  Existing permanent structures and installations are those that were present on October 21, 1976 (or prior to the designation date for Section 202 WSAs not reported to Congress). Existing wildlife facilities will be permitted to remain while the area is under wilderness review, and may be maintained as long as the maintenance conforms to the non-impairment standard.

ii.  New permanent structures and installations include not only proposed facilities, but those that were built after the dates described in c.i, immediately above. New facilities are normally not permitted in WSAs under the non-impairment criteria, but may be allowed to be constructed (or remain) if the facility meets an exception to the non-impairment criteria.

For example, facilities that clearly protect or enhance wilderness characteristics by supporting a natural distribution, number, and interaction of native species within the WSA may be allowed. Permanent wildlife facilities that meet this exception should be limited to:

(a) Structures or installations built for the benefit of threatened, endangered, or candidate species if they are determined essential to species conservation and recovery; or

(b) Structures or facilities built to restore or compensate for habitat that was lost or deteriorated from modern human influence.

iii.  Except where meeting these requirements would jeopardize the recovery of a threatened, endangered, or candidate species, in addition to meeting either ii.(a) or ii.(b) immediately above (i.e. meeting an exception to the non- impairment standard), wildlife-related permanent facilities that may be allowed by the BLM must:

(a) be necessary because a determination has been made that alternative sites outside the WSA or nonstructural alternatives will not adequately protect or enhance wilderness characteristics,

(b) be substantially unnoticeable,

(c) not have a permanent negative impact on habitat in the WSA,

(d) not create a cumulative negative impact to the vicinity's natural appearance through its proximity to other pre-existing facilities in the WSA, and

(e) not require regular vehicle use for access and/or maintenance (the

MS 6330 – Management of Wilderness Study Areas (P)

1- 36

authorizing document must describe how the project will be maintained and monitored without regular vehicle access; existing primitive routes may be used for access in WSAs as long as such use is consistent with the non-impairment standard and the applicable travel management plan).

iv. Unless the primary benefitting species is threatened, endangered, or a candidate for listing, the BLM generally will deny any wildlife water project for which evidence of the loss of historic natural water sources cannot be produced.

At a minimum, the EA or EIS for any proposed new guzzler or other water capture and delivery structure or installation must address the following:

- the number and locations of historic natural water sources within the WSA,

- the reasons these historic natural water sources have been lost or are not available to the native species,

- why the native species within the WSA are unable to sustain a natural distribution, number, and interaction through natural processes or to maintain a natural balance with their habitat due to the loss of historic natural water sources, and

- why the construction of guzzlers is a more desirable alternative than restoration of historic natural water sources.

d. Other habitat modifications. Other changes to habitat, such as altering vegetation, are covered elsewhere. See section 1.6.D.8 of this manual.

e. Stocking, gathering, and transplanting fish & wildlife. For the purposes of this section we use the following definitions:

- Native species (defined in Executive Order 13112): with respect to a particular ecosystem, a species that, other than as the result of introduction, currently occurs or historically occurred in that ecosystem.

- Non-native species (defined as "alien species" in Executive Order 13112): with respect to a particular ecosystem, any species, including its seeds, eggs, spores, or other biological material capable of propagating that species, that is not native to that ecosystem.

- Stocking: releasing a fish species.

- Gathering: collecting some or all individuals of a species and removing them from the WSA.

MS 6330 – Management of Wilderness Study Areas (P)

1- 37

- Transplanting: removal, reintroduction, or supplemental introduction of terrestrial wildlife species.

f. If the species in question is federally listed as threatened or endangered, the authority for these actions rests with the U.S. Fish and Wildlife Service or the National Oceanic and Atmospheric Administration National Marine Fisheries Service and with the States. For non-listed species, these activities typically are carried out by the State fish and wildlife management agencies, which are generally responsible for determining the type, number, and distribution of wildlife involved in these practices. The BLM is responsible for analyzing activities that could degrade wilderness characteristics to determine whether or not they would satisfy the non-impairment criteria. Close communication and coordination between the BLM and State fish and wildlife management agencies is required on all issues regarding stocking, gathering, and transplanting fish and wildlife.

i. Stocking of native fish species may be permitted within the former historical range of the species. Where non-native species were being stocked before October 21, 1976 (or prior to the designation date for Section 202 WSAs not reported to Congress) such stocking may continue. The purpose of stocking is to reestablish or maintain a native species (or non-native species introduced prior to 1976, or prior to the designation date for Section 202 WSAs not reported to Congress) adversely affected by human influence.

ii. Gathering native species (not federally listed as threatened or endangered) for relocation may be permitted as long as the non-impairment criteria are met and the gather would not create risk that the species could go into decline. This includes the use of temporary enclosures used in the gather. The BLM is responsible for the analysis and approval of any proposed surface disturbing activities or construction of structures or facilities associated with the gather.

iii. For a gather of federally listed threatened or endangered species, the non- impairment criteria may be waived under the requirements of the Endangered Species Act.

iv. Transplanting will be limited to the historical range of the species unless introduction is needed to prevent extinction or is essential for recovery. The historical range of the species is determined based on best available information in coordination with the State wildlife management agency. The non-impairment analysis (see section 1.6.E of this manual) should consider effects on naturalness, including the

MS 6330 – Management of Wilderness Study Areas (P)

1- 38

effects on habitat and native species in the WSA.

v. State and Federal agencies may use temporary enclosures and installations to transplant wildlife as long as the non-impairment criteria are met. The BLM is responsible for the analysis and approval of any proposed associated surface disturbing activities or structure or facility construction. In rare instances, permanent enclosures and related installations may be built for the benefit of threatened, endangered, or candidate species if alternative sites outside the WSA cannot be located for such construction. (See also D.11.c.)

vi. The BLM will prohibit, to extent practicable and permitted by Federal law, the introduction of any non-native species into WSAs. Exceptions to this may be made for threatened or endangered species or the rare circumstances where the BLM determines that the benefits from an introduction of a non- native species clearly outweigh the potential harm--for example, biological controls to eradicate non-native plants. To the extent practicable and permitted by Federal law, the BLM will prevent non-native species introduced elsewhere from becoming established in WSAs. As noted above, it is important for the BLM to coordinate and communicate with the State fish and wildlife agency on the prevention of non-native species introduction.

g. Removal of non-native species. Except for those species stocked prior to October 21, 1976 (or prior to the designation date for Section 202 WSAs not reported to Congress), the BLM will remove, to the extent practicable and permitted by Federal law, any non-native fish or wildlife species from WSAs, unless the BLM finds removal of the non-native species would impair the WSA and its native species—for example, non-native vegetation providing critical habitat to a threatened or endangered species. It is recognized that some non- native plant or animal species are so well-established as to make eradication not feasible.

h. Predator or other wildlife damage control.

i. Agency action—which will be coordinated with the U.S. Department of Agriculture's Animal and Plant Health Inspection Service-Wildlife Services—to control predators (or other native wildlife) in WSAs should be undertaken only:

(a) to prevent transmission of diseases or parasites affecting human health or safety;

(b) to prevent transmission of diseases or parasites affecting other native wildlife;

MS 6330 – Management of Wilderness Study Areas (P)

1- 39

    (c) to protect domestic livestock within the WSA; or

    (d) to enhance recovery of federally listed threatened or endangered species.

These actions may be taken by the U.S. Department of Agriculture's Animal and Plant Health Inspection Service-Wildlife Services, the BLM, or delegated to a State agency.  See BLM Manual 6830—Animal Damage Control.

  ii. Predator control activities must be directed at the specific offending animal or group of animals.  Such activities should be carried out so as to minimize impacts to the wilderness characteristics of the WSA (including the natural interaction of native species).

  iii. Nonnative, domestic, and feral animals maybe killed, hunted, or otherwise controlled by Federal and State agencies to protect wilderness character.

  iv. Acceptable control measures include lethal and nonlethal methods.  Criteria for choosing a particular method include need, location, environmental conditions, the preservation of wilderness characteristics, and applicable Federal and State laws.  Use only the minimum amount of control necessary to solve the problem.

  i. <u>Insect and disease control.</u> Native insect and disease control activities will be allowed only to the extent that they meet the non-impairment criteria or one of the exceptions. When specific insects and diseases are documented to be non- native or introduced organisms, then it may be reasonable to consider whether the protection and enhancement of wilderness characteristics exception to the non-impairment standard applies.

E. <u>Evaluation of Proposed Actions.</u>

  1. Uses or facilities subject to the WSA Management Manual

All uses or facilities proposed on public lands within WSAs are subject to the review requirements of the WSA Management Manual.

When conducting NEPA for projects outside of WSAs, any impacts to WSAs should be included in the NEPA analysis.  On land managed by the BLM outside a WSA, actions to protect or mitigate impacts to the WSA's wilderness characteristics may vary depending on the type of development proposed.

  a. For actions that are proposed on public lands adjacent to a WSA the NEPA document for the proposed action should consider impacts on the WSA.  Impacts to the WSA should be mitigated to the extent consistent with best management practices and applicable law.  For example, constraints

MS 6330 – Management of Wilderness Study Areas (P)

1- 40

consistent with standard terms and conditions of drilling permits may be used, including: relocation of operations of up to 200 meters; prohibition of new surface disturbance for up to 60 days in any lease year; and modification of the facility design (such as requiring low-profile equipment, engine mufflers, or specific paint colors).

All uses or facilities proposed on public lands within or adjacent to WSAs are also subject to the applicable RMP. It is important to review the RMP at the same time as the WSA Management Manual when considering a project.

2. Review requirements

All proposals subject to the WSA Management Manual must be evaluated consistent with implementing regulations, policy, and guidance using the NEPA process provided in H-1790-1. Compliance with NEPA may include use of the following: EA, EIS, DNA, or, under rare circumstances, a categorical exclusion (CX). Applicable requirements of other legislation (such as the Endangered Species Act or the National Historic Preservation Act) should be reviewed at this time.

The use of a categorical exclusion (CX) for uses and facilities within WSAs is generally not allowed. A CX can be considered only when all three of the following conditions are met and are specifically documented in the CX:

    a. the activity is listed in 43 CFR 46.210; and

    b. no extraordinary circumstances listed in 43 CFR 46.215 apply; and

    c. the activity clearly satisfies the non-impairment criteria.

In the case of emergency, the BLM may immediately take any action necessary to prevent or reduce risk to public health or safety, property, or important resources (43 CFR 46.210). Actions thereafter, including restoration, require NEPA analysis and may not be categorically excluded.

3. Procedures for evaluation of proposed actions subject to the WSA Management Manual

    a. Step 1—Review of wilderness characteristics. Upon receipt of a proposal, and before beginning any evaluation of a proposed action within a WSA, review the wilderness characteristics identified for the WSA through its inventory. There are some key phrases in the definition of wilderness characteristics that will assist in understanding how a specific proposal may or may not comply with the non-impairment standard:

        v. Size: A roadless area of contiguous public lands that "has at least 5,000 acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition."

MS 6330 – Management of Wilderness Study Areas (P)

1- 41

vi. <u>Naturalness</u>:  An area that "generally appears to have been affected primarily by the forces of nature, with the imprints of man's work substantially unnoticeable."

vii. <u>Outstanding opportunities</u>:  An area that "has outstanding opportunities for solitude or a primitive and unconfined type of recreation."

viii.    <u>Supplemental values</u>:  An area that may contain "ecological, geological, or other features of scientific, educational, scenic, or historical value." Threatened, endangered, and candidate species (such as sage grouse) should be considered supplemental values.

b.  <u>Step 2 - Review improvements to the area's wilderness characteristics.</u>

i.  Since the time of designation, the BLM may have acquired inholdings, removed evidence of human activity, or made changes that improve an area's outstanding opportunities for solitude or primitive and unconfined recreation.  These changes need to be recorded in the permanent WSA file, and the proposal must be evaluated for the effect it would have on the current wilderness characteristics conditions.

ii.  Discoveries that have occurred after the designation of the WSA may meet the criteria of being a supplemental value (e.g. paleontological resources recently discovered in the WSA), see Step 1(iv).  These values should be recorded in the permanent WSA file as they are identified. The new value should be included in the description of the affected environment in any subsequent NEPA analysis.

c.  <u>Step 3 – Notify the public.</u>

i.  All offices should notify interested parties of proposed actions on WSAs within their jurisdiction.  Notification is normally made when the purpose and need for a proposal is defined.  The notification does not require the solicitation of scoping responses, though any substantive responses from the public, either solicited or not, should be incorporated into the development of the NEPA documents.  If appropriate, such notifications should be sent directly to the interested parties. Notifications should be sent early enough to provide recipients sufficient time to inform the BLM of their concerns prior to the BLM's development of the NEPA analysis.

ii.  The notice should include a map and enough information for the recipient to understand the purpose, location, nature, size, and proposed implementation date of the proposed action.

d.  <u>Step 4 - Evaluate whether the use or facility will meet the non-impairment standard, i.e. is temporary and non-surface disturbing.</u>

MS 6330 – Management of Wilderness Study Areas (P)

1- 42

Provide written documentation of whether the proposal meets the non-impairment criteria found in section 1.6.C.1, and what impacts it will have on wilderness characteristics. Written documentation must be recorded in the NEPA analysis and decision documents. If the proposal does not meet the criteria, the BLM field officials will work with applicants to bring the proposal into compliance with the non-impairment criteria if possible.

e. Step 5 - Consider exceptions to the non-impairment standard.

Consider whether the proposal is covered by one of the exceptions to the non- impairment standard (see section 1.6.C.2 and applicable resource-specific guidance in section 1.6.D). A finding that a proposal meets an exception to the non-impairment standard will be documented and recorded in the NEPA analysis and decision documents.

f. Step 6 - Write the NEPA analysis.

Field offices must evaluate whether a proposal meets the non-impairment standard or an exception (Steps 4 or 5). This finding will be recorded in any applicable NEPA analysis. If a proposal is adequately analyzed in an existing NEPA document, a Determination of NEPA Adequacy (DNA) worksheet may be completed to document the adequacy of the existing NEPA analysis. In addition to compliance with NEPA, CEQ regulations, DOI NEPA regulations, and the BLM NEPA Handbook H-1790-1, any specific evaluation requirements located in section 1.6.D of this manual should be addressed in the NEPA analysis. To adequately analyze the wilderness resource, the following must also be included:

i.  Purpose and need for the action. The purpose and need statement should explain why the BLM is proposing the action in a WSA, in addition to meeting NEPA requirements for a "purpose and need" statement.

ii. A precise description of the proposal and its alternatives. A reasonable range of alternatives, including alternative approaches to accomplishing the same management objectives, must be analyzed in the NEPA document, including alternative sites both inside and outside the WSA. Alternatives must be described with the same level of detail as the proposed action, and include references to the particular needs of managing a WSA, including:

- Exact location and proposed time of the action.

- Design specifications, if applicable, including size, color, and materials.

- Construction methods, including machinery, equipment, or vehicles

MS 6330 – Management of Wilderness Study Areas (P)

1- 43

to be used.

- Miles, square feet, or acres of soil and vegetation disturbance.

- Maintenance schedules, techniques, procedures, and required access.

- Connected actions, such as other actions the proposal may trigger, proposals that will not proceed unless other actions are taken previously or simultaneously, or if the proposal is a part of a larger action.

  In the case of temporary facilities, a description of how and when the facility will be removed, and how the purpose and need would be resolved under those circumstances.

iii. Compliance requirements of any other applicable laws, such as the Endangered Species Act or the National Historic Preservation Act.

iv. A description of the affected environment, considering both the specific site and the WSA in its entirety, including:

- Wilderness characteristics as documented in the intensive inventory report, Wilderness Study Report, or newly identified changes to those characteristics. The characteristics the proposal may affect must be described in detail.

- Any exception to the non-impairment standard that applies to the proposal (for example, if the proposal addresses an activity related to a VER, describe the extent of the VER)

v. Written assessment of potential impacts to the affected environment, from the proposal and all alternatives, including direct and indirect effects and cumulative effects as applicable, including but not necessarily limited to effects to:

- Wilderness Characteristics. Describe the impact to the area's size, naturalness, outstanding opportunities, and supplemental values.

  o Will this proposal or its alternatives negatively or positively affect the wilderness characteristics of the WSA or a portion of the WSA?

  o Non-impairment. Will the proposal or its alternatives produce an aggregate negative effect upon the area's wilderness characteristics and values that would constrain Congress's decision to designate the area as wilderness?

  ▪ Describe the degree of impairment that would be caused by each alternative.

  - Would the proposal or alternatives result in an area reduced in size below the minimum

MS 6330 – Management of Wilderness Study Areas (P)

1- 44

threshold?

- Discuss how the proposal or alternatives would be considered substantially unnoticeable. Consider the impacts of existing, as well as proposed and future projects on the condition of being substantially unnoticeable.

- Would the proposal or alternatives result in a change in the quality of opportunities for solitude or primitive and unconfined types of recreation?

▪ Conclude whether implementation of the proposed project or alternatives will or will not conform to the non-impairment criteria. If the affects will be impairing, describe how the proposed project and alternatives are (or are not) exceptions to the non-impairment criteria described in section 1.6.C.2 and as further described in section 1.6.D.

g. Step 7 - Public comment.

The BLM will provide an appropriate comment for interested parties prior to signing a decision on all EAs or EISs involving WSAs, except when it is not possible to do so because of emergency conditions or other regulatory timeframes, e.g., 43 CFR 3802. If public response indicates more time is required, the approval period may be extended, depending upon the situation and at the discretion of the authorized officer.

h. Step 8 - Decision/record keeping.

The decision to allow or deny the proposed action and whether the action complies with the WSA Management Manual or with the 3802 regulations (for those actions covered under these regulations), must be included in the decision document and recorded in the WSA permanent documentation file.

In addition to the required inventory and WSA information, the WSA file should contain a copy of all NEPA documents pertaining to the WSA since the date of establishment. In unusual cases, the WSA file may contain a summary and cross- reference to other case files. The cross-reference will include the following information:

- The WSA name and number.

- A brief description of the proposed use or facility.

- An accurate map of the proposal.

MS 6330 – Management of Wilderness Study Areas (P)

1- 45

- A description of action taken and authorized uses and facilities (i.e. approved, disapproved, pending). A description of uses and facilities believed to be unauthorized.

- A cross-reference to the pertinent case files, decision rationale, bonding determination, documentation required in section 1.6.B. and the name of the staff member handling the case.

- Comments on problems encountered.

- Chronology of events.

- Restoration schedule.

- Evaluation of restoration efforts.

- Current status of the proposal or investigation

- Future planned actions

All subsequent compliance, noncompliance and follow-up actions must be documented in the WSA case file.


**1.7.  File and Records Maintenance.**
The BLM must maintain a permanent documentation file for each WSA.

**1.8.  Data Standards.**
All offices must utilize the NLCS data standards when developing, amending, or maintaining electronic wilderness geographic datasets.  NLCS data standards will be compatible with BLM corporate data standards such as those for the Geographic Coordinate Database, Land Status System (LR2000 etc), and the Recreation Management Information System.

MS 6330 – Management of Wilderness Study Areas (P)

G-1

## Glossary of Terms

### -C-

*Cross-country.* Travel that is not on existing access routes (ways, primitive routes, trails, boundary roads).

### -E-

*Edgeholding.* Land owned or managed by an entity other than a wilderness-managing agency that is contiguous with, but not completely surrounded by, the designated WSA boundary. See also "Inholding." Parcels touching a WSA only at a corner are not edgeholdings.

### -F-

*Facility.* Any building, structure, site improvement, element, or pedestrian route or vehicular way. The term facility generally includes things like toilets, picnic tables, fences, grills, etc.

### -I-

*Impair wilderness suitability.* To diminish an area's suitability for preservation as wilderness; violate the "non-impairment criteria" set forth in section 1.6.C of this manual.

*Inholding.* Land owned or managed by an entity other than the BLM that is completely surrounded by the WSA boundary. If two or more contiguous parcels owned by different parties are completely surrounded by the WSA except for their common borders, each is considered an inholding. See also "Edgeholding."

*Instant Study Area.* One of the 55 primitive and natural areas formally identified by the BLM through a final action published in the Federal Register before November 1, 1975. FLPMA required an accelerated wilderness review of these Wilderness Study Areas.

### -L-

*"Legacied" uses.* Uses that have been given special exemption from the non-impairment mandate. Grazing, mining, and mineral lease uses that existed on the date of approval of FLPMA (October 21, 1976) (or, for Legislative and Section 202 WSAs not reported to Congress, the date the WSA was designated) are legacied uses in WSAs.

*Legislative Wilderness Study Area.* Any WSA designated by an Act of Congress.

### -M-

*Mechanical transport.* Any vehicle, device, or contrivance for moving people or material in or

MS 6330 – Management of Wilderness Study Areas (P)

G-2

over land, water, snow, ice, or air that has moving parts as essential components of the transport and that has wheels or otherwise applies a mechanical advantage, regardless of power source.

"Mechanical transport" includes, but is not limited to: bicycles, game carts, wagons, and wheelbarrows. It does not include devices that may provide mechanical advantage but are not used for transporting material over great distances (e.g., pulleys, pry bars, or winches), or for methods of transport where the mechanical advantage is from non-moving parts (e.g., travois), or is incidental to primary means of transport (e.g., ski bindings, horse bits, or oarlocks). Wheelchairs, or other mobility devices that meet the definition of "wheelchair" in the Americans With Disabilities Act, Section 508(c), are not prohibited in WSAs.

*Motor vehicle.* Any means of transportation over land, snow, or ice that is powered by a motor, engine, or other non-living power source.

-N-

*Native Species.* With respect to a particular ecosystem, a species that, other than as the result of introduction, currently occurs or historically occurred in that ecosystem. (Defined in Executive Order 13112):

*Non-Native Species.* With respect to a particular ecosystem, any species, including its seeds, eggs, spores, or other biological material capable of propagating that species, that is not native to that ecosystem. (Defined as "alien species" in Executive Order 13112)

-P-

*Permanent Fixed Anchor.* Climber's hardware requiring the alteration of the rock where the installation is to occur that is left behind when the climber leaves the WSA.

*Pre-FLPMA.* Before October 21, 1976, the date of enactment of the Federal Land Policy and Management Act.

*Primitive Route.* Any transportation linear feature located within a WSA or lands with wilderness characteristics designated for protection by a land use plan and not meeting the wilderness inventory road definition. See also "way."

-R-

*Reclamation.* Regaining productivity, but not necessarily the area's natural biodiversity.

*Rehabilitation.* Intentionally recreating some, but not necessarily complete, species composition and structure that originally existed at the site.

*Restoration.* Reshaping topography to as close to the original contour as practicable, replacing topsoil, and recreating the native species composition, structure, and function of an ecosystem as

MS 6330 – Management of Wilderness Study Areas (P)

G-3

close as possible to that which existed at the site prior to the disturbance

-S-

*Section 202 Wilderness Study Area.* An area inventoried, found to have wilderness characteristics, and managed to preserve those characteristics under authority of the land use planning direction found in section 202 of the Federal Land Policy and Management Act of 1976. Section 202 WSAs that were identified prior to 1993 were forwarded to Congress; those identified during or after 1993 were not.

*Section 603 Wilderness Study Area.* An area inventoried, found to have wilderness characteristics, and managed to preserve those characteristics under authority of the review of public lands required by section 603 of the Federal Land Policy and Management Act of 1976.

*Substantially Unnoticeable.* Either so insignificant as to be only a very minor feature of the overall area; or is not distinctly recognizable by the average visitor as being made or caused by humans.

*Surface Disturbance.* Any new disruption of the soil or vegetation that would require restoration to return to natural appearance or ecological function.

-T-

*Temporary Use.* A use or activity, needed for a defined time period to respond to a temporary need, that would be terminated prior to or upon wilderness designation.

-U-

*Unnecessary or Undue Degradation.* Surface disturbance greater than what would normally result when an activity is being accomplished by a prudent operator in usual, customary, and proficient operations of similar character, and taking into consideration the effects of operations on other resources and land uses, including those resources and uses outside the area of operations. Failure to initiate and complete reasonable mitigation measures, including reclamation of disturbed areas, or creation of a nuisance, may constitute unnecessary or undue degradation. Failure to comply with applicable environmental protection statutes and regulations constitutes unnecessary or undue degradation.

-V-

*Valid Existing Right.* Defined in Section 701 of FLPMA as any "valid lease, permit, patent, right- of-way, or other land use right or authorization" in existence at the passage of FLPMA or, for Legislative and Section 202 WSAs, the time of designation.

-W-

MS 6330 – Management of Wilderness Study Areas (P)

G-4

*Way*. A route maintained solely by the passage of vehicles, or which has not been improved and/or maintained by mechanical means to ensure relatively regular and continuous use. See also "primitive route."

*Wilderness Area*. An area formally designated by Congress as part of the National Wilderness Preservation System.

*Wilderness Characteristics*. The attributes enumerated in the "definition of wilderness" found in Section 2(c) of the Wilderness Act of 1964. The wilderness characteristics are the area's size, apparent naturalness, outstanding opportunities for solitude or primitive recreation, and any supplemental features or values present.

*Wilderness Inventory Road*. A route that has been "improved and maintained by mechanical means to insure relatively regular and continuous use. A way maintained solely by the passage of vehicles does not constitute a road." (Defined in House Report 94-1163.)